Michael F. BRAUN, Plaintiff,

v.

SOLDIER OF FORTUNE MAGAZINE,
INC. & Omega Group, Ltd.,
Defendants.

Michael F. BRAUN & Ian
Braun, Plaintiffs,

v.

SOLDIER OF FORTUNE MAGAZINE,
INC. & Omega Group, Ltd.,
Defendants.

Civ. A. Nos. 88–H–314–N, 88–H–315–N.

United States District Court,
M.D. Alabama, N.D.

Jan. 23, 1991.
Judgment After Remittitur Feb. 6, 1991.

Perry O. Hooper, Sr., and John C. Cason, and Moore, Kendrick, Glassroth, Harris & White, Stephen R. Glassroth and L. Gilbert Kendrick, Montgomery, Ala., for plaintiff.

Rushton, Stakely, Johnston & Garrett, F. Chadwick Morriss, James W. Garrett, Jr. and Dennis R. Bailey, Montgomery, Ala., and Hogan & Hartson, E. Barrett Pretty-man, Washington, D.C., for Soldier of Fortune and Omega.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiffs Michael F. Braun and Ian Braun filed this action on March 31, 1988 against defendants Soldier of Fortune Magazine, Inc. ("SOF") and its parent company, Omega Group, Ltd., seeking damages for the wrongful death of their father, Richard F. Braun. Plaintiff Michael Braun also filed a separate action seeking recovery for personal injuries he received at the time of his father's death. Plaintiffs contended that the defendants were liable for the death of their father and for the injuries suffered by Michael Braun because the defendants negligently published a personal service advertisement in Soldier of Fortune magazine which created an unreasonable risk of the solicitation and commission of violent criminal activity, including murder.

On December 7, 1990, following a five day trial, the jury returned a verdict in favor of plaintiffs and awarded compensatory damages on the wrongful death claim in the amount of $2,000,000. The jury also awarded Michael Braun $375,000 in compensatory damages and $10,000,000 in punitive damages for his personal injury claim. Defendants have filed a motion for judgment notwithstanding the verdict, or in the alternative for a new trial, or in the alternative, for remittitur. A hearing was held on this motion on January 18, 1991.

## I. STANDARD OF REVIEW

The standard to be applied by this Court in considering this motion was set forth in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

*Id.* at 374–75, *quoted in Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir.1990). A review of the evidence shows that the under the *Boeing* standard, defendants' motion for judgment N.O.V. is due to be denied.

## II. EVIDENCE AT TRIAL

■ The evidence presented at trial revealed a sequence of events which have not been the source of much dispute. On August 26, 1985, as Richard Braun and his sixteen year-old son Michael were leaving Richard Braun's suburban Atlanta home, Sean Trevor Doutre stepped in front of Braun's car and fired several shots into the car with a MAC 11 automatic pistol. Rich-

ard and Michael rolled out of the car on opposite sides onto the driveway. Doutre walked over and fired two more shots into the back of Richard Braun's head. Doutre then walked over to Michael, who had been shot in the thigh, raised his gun and aimed it at Michael, but did not fire. Instead, Doutre put his finger over his lips signaling Michael to be quiet and ran into the woods.

Doutre was the contract killer employed by Richard Savage. Bruce Gastwirth, Richard Braun's business associate, used John Horton Moore to contact and hire Savage to kill Richard Braun. Gastwirth learned of Savage through an ad that Savage had placed in Soldier of Fortune Magazine, which read:

> GUN FOR HIRE: 37–year–old professional mercenary desires jobs. Vietnam Veteran. Discreet and very private. Body guard, courier, and other special skills. All jobs considered. Phone (615) 436–9785 (days) or (615) 436–4335 (nights), or write: Rt. 2, Box 682 Village Loop Road, Gatlinburg, TN 37738.

Ms. Joan Steele, SOF's advertising manager at the time the Savage ad was placed, edited the Savage ad herself, and had several contacts with Savage concerning the wording of his ad. She required that the phrase "any and all jobs" be deleted from Savage's ad. Before running the Savage ad in SOF, she sent Savage a letter explaining the need to change the language in his ad. Savage responded by telling Ms. Steele to edit the ad any way she liked. The end result was that the original phrase "any and all jobs considered" was edited by her to read "all jobs considered." The only explanation that she could offer for the change was that the phrase "any and all jobs considered" was too vague; hence, the substitution "all jobs considered." [1]

Savage testified that, after the ad appeared in SOF, he received some thirty calls a week inquiring as to his availability to perform various criminal acts, including many that solicited his services for kidnapping or murder. Quite clearly, the language contained in Savage's ad was acted upon by many people as an offer to commit serious violent crime. Savage agreed to kill other persons where his services were solicited in response to the ad. In some of these instances, he accepted "up front" money but never actually performed the job. Doutre, the triggerman who killed Richard Braun and shot Michael Braun, saw the Savage ad in SOF and traveled from Canada to go to work for Savage. Doutre executed at least two people for Savage after persons contacted Savage through the SOF ad.

The publisher and founder of SOF, Robert K. Brown, and Ms. Steele, the magazine's former advertising manager, both denied having any knowledge of criminal activity associated with personal service ads placed in the magazine. In an attempt to show that defendants knew of the likelihood that criminal activity would result from placing an ad of the type in question, plaintiffs introduced evidence of various newspaper and magazine articles relating to crimes linked to SOF personal services ads. Plaintiffs also showed that defendants subscribed to a clipping service which sent articles to SOF from hundreds of newspapers and magazines containing the slightest mention of SOF. SOF maintained a multi-volume collection of these articles which were introduced into evidence. These volumes did not include, however, the articles involving crimes that allegedly were committed in response to SOF ads even though some of the articles relating to such crimes and linking those crimes to ads in SOF magazine appeared in national publications such as Time and Newsweek, as well as local publications in Colorado, which is SOF's home. For example, one such crime of kidnapping occurred in Boulder, Colorado where SOF is published. The crime was reported prominently in the Boulder and Denver newspapers, and referred to a report that the crime had been in response to an ad in SOF. In another instance, persons at SOF were contacted by law enforcement officials from

---

1. Editing was done on the personal service ads ostensibly to improve the "image" of the magazine, which was attempting to attract larger corporate commercial advertisers.

Houston, Texas concerning an ad in SOF that led to the prosecution of an individual who had solicited someone through an SOF ad to poison his wife. It is apparent that the jury did not believe that SOF was unaware of the risks associated with running an ad such as the one placed by Richard Savage, and the evidence is more than sufficient to support such a finding. Although defendants have objected continuously to the introduction of any evidence of any other ads placed in SOF other than the ad in question, such evidence was admitted where reports of such ads being linked to other crimes were reported to SOF officials or where such reports were in newspapers or magazines that reasonably would have come to the attention of defendants' personnel.

The Court finds that defendants' reliance on *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830 (5th Cir.1989) is misplaced. The Court does not read *Eimann* to be as sweeping as defendants contend. In fact, the holding in *Eimann* is quite narrow. The Fifth Circuit held that the ad in question in *Eimann* was, as a matter of Texas tort law, too ambiguous to impose liability on the publisher for the consequences of running that ad. *Id.* at 834. The ad in *Eimann* did not contain the language "Gun for Hire" and was different in several other respects as well. The differences between the two ads are readily apparent upon a reading of the *Eimann* ad, which read:

> EX–MARINES—67–69 'Nam Vets, Ex–DI, weapons specialist—jungle warfare, pilot, M.E., high risk assignments. U.S. or overseas. (404) 991–2684.[2]

The *Eimann* court did not hold that a publisher may never be held liable for publishing an ad that presents a risk that violent criminal activity will result, but rather, the court stated that *"[w]ithout a more specific indication of illegal intent* than Hearn's ad or its context provided, we conclude that SOF did not violate the required standard of conduct by publishing an ad that later played a role in criminal activity." *Id.* at 838 (emphasis added). Applying the familiar balancing test established by Judge Learned Hand in *United States v. Carroll Towing*, 159 F.2d 169, 173 (2d Cir.1947), the *Eimann* court simply held that, due to the ambiguous wording of the ad in that case, the duty placed on the publisher to determine whether the ad contained an offer to commit criminal acts was too burdensome in spite of the grave danger that would be present if the ad did, in fact, contain such an offer.[3] *Eimann*, 880 F.2d at 837.

At the summary judgment stage of this case, this Court found that there was a sufficient indication of illegal intent in the Savage ad to preclude the Court from granting summary judgment in favor of defendants based on the *Eimann* decision. *Braun v. Soldier of Fortune Magazine*, 749 F.Supp. 1083 (M.D.Ala.1990). This Court views the SOF ad run by Savage as materially different than the ad in *Eimann*, which the *Eimann* court described as "at most ... a facially innocuous ad." *Eimann*, 880 F.2d at 836. The *Eimann* ad contained none of the phrases contained in the Savage ad such as "Gun for Hire," "Discrete and very private," or "All jobs considered." The question of whether a reasonable publisher should have foreseen that publication of the Savage ad presented an unreasonable risk that criminal activity would result was left properly to the jury. *See also Norwood v. Soldier of Fortune Magazine, Inc.*, 651 F.Supp. 1397 (W.D. Ark.1987). The evidence in this case fully supports the jury's determination that defendants did not conform to the applicable standard of conduct, and that such negligent conduct was the proximate cause of Richard Braun's death and Michael Braun's injuries. It is apparent that an ad containing the terms "Gun for Hire," "Discreet

---

**2.** The term "ex-DI" meant the advertiser was an ex-drill instructor; "M.E." referred to multi-engine planes.

**3.** Defendant SOF argues that in *Eimann,* just as in this case, 90% of the callers who responded to the SOF ad sought participation in illegal activities, including beatings, kidnappings, jail breaks, bombings, and murders; nevertheless the *Eimann* court thought that ad imposed no basis for liability on its publisher.

and very private," and "All jobs considered" will be reasonably construed as an offer to perform illegal acts. This is no strained construction. A risk becomes unreasonable when its magnitude outweighs the social utility of the act or omission that creates the risk. *See Restatement (Second) of Torts* § 291 (1965). The risk in the Savage ad was the risk of murder or serious, violent crime.[4] Accordingly, defendants' motion for judgment notwithstanding the verdict is DENIED.

## III. EXCESSIVENESS OF THE VERDICT

■ Defendants also have moved for a new trial, or alternatively, for remittitur. The first step for the Court is to determine whether the jury's award in this case is "grossly excessive." *Wilson v. Taylor*, 733 F.2d 1539, 1548 (11th Cir.1984) (quoting *Grunenthal v. Long Island R. Co.*, 393 U.S. 156, 159 n. 4, 89 S.Ct. 331, n. 4, 21 L.Ed.2d 309 (1968)). The *Wilson* court also stated that the court should look to see whether the verdict is so high that it "would be a denial of justice to permit it to stand." *Id.* at 1548–49. In determining whether a given verdict is excessive, the Court is mindful that it is not to analyze the amount of the verdict in terms of whether it is higher than what the Court personally would have awarded. *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1047 (5th Cir.1970), *modified*, 456 F.2d 180 (5th Cir.), *cert. denied*, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972). The Court also is aware of the dangers of simply comparing verdicts rendered in different cases as a method for determining excessiveness. The facts of each case determine whether a jury award is excessive. *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 364–65 (5th Cir.1980) (citing *Wiley v. Stensaker Schiffahrtsges*, 557 F.2d 1168, 1172 (5th Cir.1977)). With this standard in mind, we look to the injuries suffered by plaintiffs in this case.

### A. *Compensatory Damages*

■ The jury awarded plaintiffs $2,000,000.00 in compensatory damages for the wrongful death of Richard Braun. Under Georgia law, punitive damages may not be awarded in wrongful death cases. Compensatory damages may be awarded to compensate plaintiffs for the "full value of the life of the decedent without deducting for any of the necessary or personal expenses of the decedent had he lived." O.C. G.A. § 51-4-1. In order to establish a monetary estimation of the full value of the life of Richard Braun, plaintiffs presented the testimony of Dr. Robert Hebert, a Professor of Economics at Auburn University. Dr. Hebert calculated that the economic loss resulting from the death of Richard Braun would have been approximately $2,300,000.00. On cross-examination, defendants' counsel attempted to show to the jury that Dr. Hebert's calculations were flawed. The ultimate decision of how much to award plaintiffs for the full value of the life of the decedent was left properly to the jury. The jury's determination that plaintiffs were entitled to $2,000,000.00 for the wrongful death claim clearly is supported by the evidence, and will not be disturbed by the Court.

■ The jury also awarded Michael Braun $375,000.00 in compensatory damages for the injuries he suffered. The Court does not find that this amount is excessive as a matter of law. At age sixteen, Michael was shot and watched as his father was summarily executed. The damages suffered from witnessing this tragic event will stay with Michael for a lifetime. In addition, Michael lay in terror as the gunman leveled his weapon to execute Michael, and then changed his mind and spared Michael's life, which resulted in additional pain and suffering. The Court cannot say that the amount of the jury's award is excessive.

---

**4.** Defendants contend that, as a matter of law, any negligence they may have committed cannot be the proximate cause of the damages suffered by plaintiffs because of the intervening criminal acts of third parties. Where the criminal act, however, is the very thing that is foreseeable from a negligent act, it will not serve to insulate the original negligent actor from liability. *See Cain v. Vontz*, 703 F.2d 1279 (11th Cir.1983) (applying Georgia law).

### B. *Punitive Damages*

■ As stated above, the jury was precluded from awarding any punitive damages under the Georgia wrongful death statute. Such a prohibition did not apply, however, to Michael's personal injury claim. In addition to the award of $375,000 in compensatory damages, the jury awarded Michael $10,000,000 in punitive damages. In accordance with Georgia law, this award was based on a finding by the jury that the defendants conduct was performed maliciously or with an entire want of care which would raise the presumption of conscious indifference to the consequences of running the ad. *General Refractories Co. v. Rogers,* 240 Ga. 228, 230, 239 S.E.2d 795, 798 (1977); *Associated Health Systems, Inc. v. Jones,* 185 Ga.App. 798, 366 S.E.2d 147 (1988).

The Court finds that there was sufficient evidence before the jury to support a finding that the defendants' acted with an entire want of care so as to justify the imposition of punitive damages. In the opinion of the Court, however, an award of $10,000,-000 in punitive damages is excessive in that a smaller sum will fully vindicate the purposes of punitive damages under Georgia law.[5] *Hospital Authority of Gwinnett County v. Jones,* 259 Ga. 759, 386 S.E.2d 120, 122 (1989).

### IV. REMITTITUR

Given that the Court finds that the jury's award of punitive damages is excessive, the Court must determine what remedy is appropriate. Although in some cases, the court may grant a new trial where the award of damages by the jury is excessive, the court also has the discretion to "use the remittitur practice whereby it denies the defendant's motion for a new trial on condition the plaintiff remits a stated amount." *Wilson,* 733 F.2d at 1549 (quoting 6A *Moore's Federal Practice* § 59.08[6] (2d ed. 1983)). In light of the evidence presented in this case, the Court finds that remittitur is appropriate.

Once the court has determined that a verdict is excessive and that remittitur is appropriate, the amount of the remittitur must be set. In fixing the amount of remittitur in lieu of a new trial, this Court is guided by the "maximum recovery rule." *Jackson v. Magnolia Brokerage Co.,* 742 F.2d 1305, 1306–07 (11th Cir.1984). Under this rule, the court reduces the award to the "maximum limit of a reasonable range within which the jury may properly operate." *Warren v. Ford Motor Credit Co.,* 693 F.2d 1373, 1380 (11th Cir.1982) (citations omitted).

As noted, an award of punitive damages is for the purpose of deterring the defendant and others from committing similar wrongs in the future and to serve as compensation for the "wounded feelings" of the plaintiff.[6] In the opinion of the Court, an award of $2,000,000 would sufficiently serve to deter defendants and others from running similar ads, as well as providing sufficient compensation for Michael Braun's "wounded feelings." Accordingly, the Court finds that a remittitur of punitive damages in Michael Braun's personal injury case in the amount of $8,000,000 is required, leaving a punitive damages award of $2,000,000. An order in accordance with this opinion will be entered separately.

---

5. In some cases, it has been noted that the term "punitive damages" is a misnomer to describe the damages allowable under O.C.G.A. § 51–12–5 (1982). *Wammock v. Celotex Corp.,* 835 F.2d 818, 820 n. 3 (11th Cir.1988) (analyzing punitive damages under Georgia law). That code section has since been amended to make the term "punitive damages" under Georgia law synonymous with the terms "vindictive damages" or "exemplary damages," which are commonly used to describe damages designed to punish a defendant. O.C.G.A. § 51–12–5.1(a) (Supp.1987). *See also Salsbury Laboratories v. Merieux Laboratories,* 908 F.2d 706, 715 (11th Cir.1990) (applying Georgia law).

In addition to deterrence, one of the rationales for punitive damages under Georgia law is to compensate for "the wounded feelings of the plaintiff." These wounded feelings "are not the same in nature as ordinary mental pain and suffering resulting from a physical injury. The former expression relates to the self-respect, sensibilities or pride of a person." *Wammock,* 835 F.2d at 821 n. 5 (quoting *Interstate Life and Accident Co. v. Brewer,* 56 Ga.App. 599, 609, 193 S.E. 458, 464 (1937)). Accordingly, there is no duplication in plaintiff Michael Braun's award of compensatory and punitive damages.

6. *See* note 5, *supra.*

### JUDGMENT AFTER REMITTITUR

The above entitled action having been tried before this Court and a jury on December 3–7, 1990, and the jury having rendered a verdict in favor of plaintiffs and against defendants and assessed damages at $10,375,000 in CA No. 88–H–314–N and $2,000,000 in CA No. 88–H–315–N, and the Court having ordered that defendants' motion for a new trial would be granted unless plaintiffs agreed to a remittitur to reduce the verdict in CA No. 88–H–314–N to the sum of $2,375,000, and plaintiffs having filed on February 6, 1991, their Acceptance of Remittitur, it is

ORDERED, ADJUDGED and DECREED that plaintiff Michael Braun have and recover of defendants Soldier of Fortune Magazine, Inc. and Omega Group, Ltd. the total sum of $2,375,000 for his personal injury claim in CA No. 88–H–314–N, consisting of $375,000 in compensatory damages and $2,000,000 in punitive damages, and that court costs incurred in these proceedings be taxed against these defendants. The judgment entered in CA No. 88–H–315–N on December 10, 1990 is unchanged.