968 F.2d 1110
 61 USLW 2141, 20 Media L. Rep. 1777
 Michael F. BRAUN, Plaintiff-Appellee,
v.
SOLDIER OF FORTUNE MAGAZINE, INC. and Omega Group, Ltd.,
Defendants-Appellants.
Michael F. BRAUN and Ian Braun, Plaintiffs-Appellees,
v.
SOLDIER OF FORTUNE MAGAZINE, INC. and Omega Group, Ltd.,
Defendants-Appellants.
 No. 91-7130.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 13, 1992.
 
 F. Chadwick Morriss, James W. Garrett, Jr., Dennis R. Bailey, Rushton, Stakely, Johnston & Garrett, Pa., Montgomery, Ala., E. Barrett Prettyman, Jr., Ronald J. Wiltsie, II, A. Lee Bentley, III, Hogan & Hartson, Washington, D.C., for defendants-appellants.
 L. Gilbert Kendrick, Stephen R. Glassroth, Kendrick & Glassroth, John C. Cason, Montgomery, Ala., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before ANDERSON and DUBINA, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 Soldier of Fortune Magazine, Inc., and its parent, Omega Group, Ltd., (hereinafter collectively referred to as "SOF") appeal a $4,375,000 jury verdict against them in a consolidated tort action brought by Michael and Ian Braun, the sons of a murder victim. The jury found that SOF acted with negligence and malice in publishing a personal service advertisement through which plaintiffs' father's business partner hired an assassin to kill him. We affirm the judgment entered on the jury's verdict.
 
 I. FACTS
 
 2
 In January 1985, Michael Savage submitted a personal service advertisement to SOF. After several conversations between Savage and SOF's advertising manager, Joan Steel, the following advertisement ran in the June 1985 through March 1986 issues of SOF:
 
 
 3
 GUN FOR HIRE: 37 year old professional mercenary desires jobs. Vietnam Veteran. Discrete [sic] and very private. Body guard, courier, and other special skills. All jobs considered. Phone (615) 436-9785 (days) or (615) 436-4335 (nights), or write: Rt. 2, Box 682 Village Loop Road, Gatlinburg, TN 37738.
 
 
 4
 Savage testified that, when he placed the ad, he had no intention of obtaining anything but legitimate jobs. Nonetheless, Savage stated that the overwhelming majority of the 30 to 40 phone calls a week he received in response to his ad sought his participation in criminal activity such as murder, assault, and kidnapping. The ad also generated at least one legitimate job as a bodyguard, which Savage accepted.
 
 
 5
 In late 1984 or early 1985, Bruce Gastwirth began seeking to murder his business partner, Richard Braun. Gastwirth enlisted the aid of another business associate, John Horton Moore, and together they arranged for at least three attempts on Braun's life, all of which were unsuccessful. Responding to Savage's SOF ad, Gastwirth and Moore contacted him in August 1985 to discuss plans to murder Braun.
 
 
 6
 On August 26, 1985, Savage, Moore, and another individual, Sean Trevor Doutre, went to Braun's suburban Atlanta home. As Braun and his sixteen year-old son Michael were driving down the driveway, Doutre stepped in front of Braun's car and fired several shots into the car with a MAC 11 automatic pistol. The shots hit Michael in the thigh and wounded Braun as well. Braun managed to roll out of the car, but Doutre walked over to Braun and killed him by firing two more shots into the back of his head as Braun lay on the ground.
 
 II. PROCEEDINGS BELOW
 
 7
 On March 31, 1988, appellees Michael and Ian Braun filed this diversity action against appellants in the United States District Court for the Middle District of Alabama, seeking damages for the wrongful death of their father. Michael Braun also filed a separate action seeking recovery for the personal injuries he received at the time of his father's death. The district court consolidated these related matters.
 
 
 8
 Trial began on December 3, 1990. Appellees contended that, under Georgia law, SOF was liable for their injuries because SOF negligently published a personal service advertisement that created an unreasonable risk of the solicitation and commission of violent criminal activity, including murder. To show that SOF knew of the likelihood that criminal activity would result from placing an ad like Savage's, appellees introduced evidence of newspaper and magazine articles published prior to Braun's murder which described links between SOF personal service ads and a number of criminal convictions including murder, kidnapping, assault, extortion, and attempts thereof.[1] Appellees also presented evidence that, prior to SOF's acceptance of Savage's ad, law enforcement officials had contacted SOF staffers on two separate occasions in connection with investigations of crimes--a solicitation to commit murder in Houston, Texas, and a kidnapping in New Jersey--linked to SOF personal service ads.
 
 
 9
 In his trial testimony, SOF president Robert K. Brown denied having any knowledge of criminal activity associated with SOF's personal service ads at any time prior to Braun's murder in August 1985.[2] Both Jim Graves, a former managing editor of SOF, and Joan Steel, the advertising manager who accepted Savage's advertisement, similarly testified that they were not aware of other crimes connected with SOF ads prior to running Savage's ad. Steel further testified that she had understood the term "Gun for Hire" in Savage's ad to refer to a "bodyguard or protection service-type thing," rather than to any illegal activity.
 
 
 10
 At the end of the five day trial, the district court gave the following instructions on negligence to the jury:
 
 
 11
 In order to prevail in this case Plaintiffs must prove to your reasonable satisfaction by a preponderance of the evidence that a reasonable reading of the advertisement in this case would have conveyed to a magazine publisher, such as Soldier of Fortune, that this ad presented the clear and present danger of causing serious harm to the public from violent criminal activity. The Plaintiffs must prove that the ad in question contained a clearly identifiable unreasonable risk, that the offer in the ad is one to commit a serious violent crime, including murder.
 
 
 12
 Now, while Defendants owe a duty of reasonable care to the public, the magazine publisher does not have a duty to investigate every ad it publishes. Defendants owe no duty to the Plaintiffs for publishing an ad if the ad's language on its face would not convey to the reader that it created an unreasonable risk that the advertiser was available to commit such violent crimes as murder.
 
 
 13
 Now, of course, the tendency to read the advertisement in question in hindsight is hard to avoid, but it must be avoided. The test for you is not how the advertisement in question reads now in light of subsequent events, but rather how the advertisement read to a reasonable publisher at the time of publication. You should view the facts and these instructions with particular care in this case, in view of the First Amendment to the Constitution, which protects the free flow of truthful and legitimate information even when it is of a commercial rather than a political nature.
 
 
 14
 The district court further instructed that, if the jury found that SOF was negligent and that this negligence was the proximate cause of appellees' father's death, it could "award damages for the value of the life of Richard Braun," but not for mental anguish, emotional distress, or the family's loss of companionship. The court also stated that, if the jury found that SOF was negligent and that this negligence was the proximate cause of appellee Michael Braun's injuries, it could award full compensation, including recovery for both physical pain and mental anguish. The district court also noted that Georgia law permitted punitive damages for appellee Michael Braun's personal injury claim but that, to award punitive damages, the jury must first find that SOF "acted maliciously or with an entire want of care which constitutes conscious indifference to the consequences."
 
 
 15
 The jury returned a verdict in favor of appellees and awarded compensatory damages on the wrongful death claim in the amount of $2,000,000. The jury also awarded appellee Michael Braun $375,000 in compensatory damages and $10,000,000 in punitive damages for his personal injury claim. The district court entered judgment in accordance with the jury's verdict on December 7, 1990.
 
 
 16
 On January 23, 1991, the district court denied SOF's motion for judgment notwithstanding the verdict, but ruled that it would grant SOF's motion for a new trial unless there were an agreement to a remittitur reducing the punitive damages awarded to $2,000,000. Appellees agreed to the remittitur, and an amended judgment was entered on February 6, 1991. 757 F.Supp. 1325. SOF appeals.
 
 III. DISCUSSION
 
 17
 The district court, sitting in Alabama, properly looked to Georgia law in resolving appellees' negligence claims. In Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 494, 61 S.Ct. 1020, 1020, 85 L.Ed. 1477 (1941), the Supreme Court held that "in diversity cases the federal courts must follow conflict of laws rules prevailing in the states in which they sit." Under Alabama law, "the substantive law of the state where the injury occurred is applied when suit is brought in Alabama." Bodnar v. Piper Aircraft Corp., 392 So.2d 1161, 1162 (Ala.1980). Since Richard Braun's murder and appellee Michael Braun's injuries both occurred in Georgia, Alabama conflict of laws rules required that the district court apply Georgia law.
 
 A. Duty Under Georgia Law
 
 18
 To prevail in an action for negligence in Georgia, a party must establish the following elements:
 
 
 19
 (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.
 
 
 20
 Bradley Center, Inc. v. Wessner, 250 Ga. 199, 296 S.E.2d 693, 695 (1982) (citing Lee Street Auto Sales, Inc. v. Warren, 102 Ga.App. 345, 116 S.E.2d 243, 245 (1960)). Under Georgia law, the existence of a legal duty presents a threshold question of law for the court. First Federal Sav. Bank of Brunswick v. Fretthold, 195 Ga.App. 482, 394 S.E.2d 128, 131 (1990). Once a court finds that a legal duty exists, it generally leaves for the jury issues of negligence and proximate cause. Hogan v. Pony Exp. Courier Corp., 195 Ga.App. 592, 394 S.E.2d 391, 392 (1990).
 
 
 21
 The district court found that publishers like SOF have a duty to the public when they publish an advertisement if "the ad in question contain[s] a clearly identifiable unreasonable risk, that the offer in the ad is one to commit a serious violent crime, including murder." SOF argues that the district court erred in finding that a publisher has a duty "to reject ambiguous advertisements that pose a threat of harm," Brief for Appellants at 24, and contends that a publisher should be held liable for publishing an ad only if the ad explicitly solicits a crime. Since the existence of a duty presents a question of law, we subject the district court's determination to de novo review. Newell v. Prudential Ins. Co. of America, 904 F.2d 644, 649 (11th Cir.1990).
 
 
 22
 Georgia courts recognize a "general duty one owes to all the world not to subject them to an unreasonable risk of harm." Bradley Center, 296 S.E.2d at 695. Accordingly, the district court properly found that SOF had a legal duty to refrain from publishing advertisements that subjected the public, including appellees, to a clearly identifiable unreasonable risk of harm from violent criminal activity. To the extent that SOF denies that a publisher owes any duty to the public when it publishes personal service ads, its position is clearly inconsistent with Georgia law. We believe, however, that the crux of SOF's argument is not that it had no duty to the public, but that, as a matter of law, the risk to the public presented when a publisher prints an advertisement is "unreasonable" only if the ad openly solicits criminal activity. See Reply Brief for Appellants at 24.
 
 1. Risk-Utility Balancing
 
 23
 To determine whether the risk to others that an individual's actions pose is "unreasonable," Georgia courts generally apply a risk-utility balancing test. See Hanchey v. Hart, 120 Ga.App. 677, 171 S.E.2d 918, 921 (1969); Johnson v. Thompson, 111 Ga.App. 654, 143 S.E.2d 51, 53 (1965); Ely v. Barbizon Towers, Inc., 101 Ga.App. 872, 115 S.E.2d 616, 620 (1960). A risk is unreasonable if it is "of such magnitude as to outweigh what the law regards as the utility of the defendant's alleged negligent conduct." Johnson, 143 S.E.2d at 53. Simply put, liability depends upon whether the burden on the defendant of adopting adequate precautions is less than the probability of harm from the defendant's unmodified conduct multiplied by the gravity of the injury that might result from the defendant's unmodified conduct. United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947).
 
 
 24
 For the reasons stated below, we find that the district court properly struck the risk-utility balance when it instructed that the jury could hold SOF liable for printing Savage's advertisement only if the advertisement on its face would have alerted a reasonably prudent publisher to the clearly identifiable unreasonable risk of harm to the public that the advertisement posed. Our application of Georgia's risk-utility balancing principles persuades us that the duty of care the district court imposed on publishers was an appropriate reconciliation of Georgia's interest in providing compensation to victims of tortious conduct with the First Amendment concern that state law not chill protected speech. Accordingly, we reject SOF's argument that the district court's instructions "place[d] an intolerable burden upon the press." Brief for Appellants at 20.
 
 
 25
 SOF relies heavily on Eimann v. Soldier of Fortune Magazine, Inc., 880 F.2d 830 (5th Cir.1989), cert. denied, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990), to support its contention that the district court erred in its application of risk-utility balancing to this case. In Eimann, the son and mother of a murder victim brought a wrongful death action under Texas law against SOF, seeking to hold SOF liable for publishing a personal service ad through which the victim's husband hired an assassin to kill her. The advertisement in question read:
 
 
 26
 EX-MARINES--67-69 'Nam Vets, Ex-DI, weapons specialist-jungle warfare, pilot, M.E., high risk assignments, U.S. or overseas. (404) 991-2684.
 
 
 27
 Id. at 831. The district court instructed the jury that it could find SOF liable if "(1) the relation to illegal activity appears on the ad's face; or (2) 'the advertisement, embroidered by its context, would lead a reasonable publisher of ordinary prudence under the same or similar circumstances to conclude that the advertisement could reasonably be interpreted' as an offer to commit crimes." Id. at 833 (quoting district court instructions). The jury found for plaintiffs and awarded them $1.9 million in compensatory damages and $7.5 million in punitive damages. Id.
 
 
 28
 The Fifth Circuit reversed the jury's verdict. After applying Texas risk-utility balancing principles similar to Georgia's, the court concluded that "[t]he standard of conduct imposed by the district court against SOF is too high...." Id. at 838. To impose liability whenever the advertised product "could reasonably be interpreted as an offer to engage in illegal activity" would require a publisher to reject all ambiguous ads. Id. at 837. The court stated: "Without a more specific indication of illegal intent than [this] ad or its context provided, we conclude that SOF did not violate the required standard of conduct by publishing an ad that later played a role in criminal activity." Id. at 838.
 
 
 29
 SOF's reliance on Eimann is misplaced. We distinguish Eimann from this case based on the instructions to the respective juries.[3] In Eimann, the district court violated risk-utility balancing principles when it allowed the jury to impose liability on SOF if a reasonable publisher would conclude "that the advertisement could reasonably be interpreted" as an offer to commit crimes. 880 F.2d at 833 (emphasis added). The Fifth Circuit correctly observed that virtually anything might involve illegal activity, id. at 837, and that applying the district court's standard would mean that a publisher "must reject all [ambiguous] advertisements," id. at 838 (emphasis in original), or risk liability for any "untoward consequences that flow from his decision to publish" them, id.
 
 
 30
 In this case, the district court stressed in its instructions that the jury could hold SOF liable only if the ad on its face contained a "clearly identifiable unreasonable risk" of harm to the public. We are convinced that the district court's use of phrases like "clear and present danger" and "clearly identifiable unreasonable risk" properly conveyed to the jury that it could not impose liability on SOF if Savage's ad posed only an unclear or insubstantial risk of harm to the public and if SOF would bear a disproportionately heavy burden in avoiding this risk.[4] The jury instructions in Eimann, in contrast, did not preclude the jury from imposing liability on the basis of an ambiguous advertisement that presented only an unclear risk of harm to the public.
 
 
 31
 Furthermore, in Eimann, the district court instructed that, even if the face of the ad did not reveal its connection to illegal activity, the jury could hold the publisher liable if a reasonably prudent publisher would discover the connection to crime through investigation of the advertisement's "context." 880 F.2d at 833. It is significant that the district court in this case did not impose such a duty. See infra part III.A.2. The district court here stressed that the jury could find SOF liable only if Savage's ad "on its face" would convey to a reasonable publisher that the ad created a "clearly identifiable unreasonable risk" of harm to the public.
 
 
 32
 For the foregoing reasons, we conclude that the decision in Eimann is distinguishable.
 
 2. First Amendment Limitations
 
 33
 SOF further argues that the district court erred in instructing the jury to apply a negligence standard because the First Amendment forbids imposing liability on publishers for publishing an advertisement unless the ad openly solicits criminal activity. We agree with appellants that "the Constitution delimits a State's power" to award remedies for civil torts. New York Times v. Sullivan, 376 U.S. 254, 283, 84 S.Ct. 710, 727, 11 L.Ed.2d 686 (1964).[5] In cases where state laws burden the exercise of freedom of speech, the Supreme Court has stressed that judges must attempt "to reconcile state law with ... competing interest[s] grounded in the constitutional command of the First Amendment." Gertz v. Robert Welch, Inc., 418 U.S. 323, 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).[6] Therefore, we must evaluate the district court's instructions to ensure that they adequately protected the First Amendment values this case presents.
 
 
 34
 In Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (hereinafter Virginia Pharmacy Board) (quoting Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)), the Supreme Court recognized that the First Amendment protects speech that, like Savage's ad, "does 'no more than propose a commercial transaction.' " The Court observed that a "particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate." 425 U.S. at 763, 96 S.Ct. at 1826. In addition, the Court noted that society has an interest in commercial speech because it facilitates intelligent and well-informed economic decisions. Id. at 765, 96 S.Ct. at 1827; see also Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, 447 U.S. 557, 561-62, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980).
 
 
 35
 Imposing tort liability for publishing advertisements that result in injury directly implicates the First Amendment interest in commercial speech. It is well-settled that the First Amendment does not protect commercial speech "related to illegal activity," Central Hudson, 447 U.S. at 564, 100 S.Ct. at 2350, and, thus, there is no constitutional interest in publishing personal service ads that solicit criminal activity, Pittsburgh Press, 413 U.S. at 388, 93 S.Ct. at 2560 ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."). However, if state tort law places too heavy a burden on publishers with respect to the advertisements they print, the fear of liability might impermissibly impose a form of self-censorship on publishers. See Michael I. Meyerson, This Gun for Hire: Dancing in the Dark of the First Amendment, 47 Wash. & Lee L.Rev. 267, 270 (1990). Such a chilling effect would compromise the First Amendment interest in commercial speech by depriving protected speech "of a legitimate and recognized avenue of access to the public." Manual Enterprises, Inc. v. Day, 370 U.S. 478, 493, 82 S.Ct. 1432, 1440, 8 L.Ed.2d 639 (1962).
 
 
 36
 This case poses a greater risk than one finds in ordinary commercial speech cases that a state's regulatory regime or tort law will impermissibly chill publishers from printing commercial speech that enjoys First Amendment protection. Most cases involving regulation of commercial speech present only a minor risk that overly broad regulation will chill protected commercial speech because, generally speaking, "advertising is linked to [the] commercial well-being" of the speaker. Bates v. State Bar of Arizona, 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); see also Board of Trustees of State University of New York v. Fox, 492 U.S. 469, 481, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989); Virginia Pharmacy Board, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24. The advertiser's strong economic interest helps ensure that its particular message reaches the public, even in the face of restrictive regulations. However, "in the advertising context, a publisher only provides a forum for the actual speaker as a means of communicating with the listener." Lisa F. Firenze, Note, Publishers' Liability for Commercial Advertisements: Testing the Limits of the First Amendment, 23 Col.J.L. & Soc.Probs. 137, 167 (1990). Accordingly, since "[p]ublishers do not tout their own products or services," they "have a far smaller financial interest than advertisers in the advancement of any one particular product or service." Id. at 149.
 
 
 37
 SOF further argues that imposing liability on publishers for the advertisements they print indirectly threatens core, non-commercial speech to which the Constitution accords its full protection. Cf. Central Hudson, 447 U.S. at 562-63, 100 S.Ct. at 2350 (First Amendment affords greater protection to non-commercial speech); Virginia Pharmacy Board, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24 (same). In Eimann, 880 F.2d at 837, the Fifth Circuit agreed that "the publication's editorial content would surely feel the economic crunch from loss of revenue that would result if publishers were required to reject all ambiguous advertisements." See also United States v. Hunter, 459 F.2d 205, 212 (4th Cir.), cert. denied, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972); Walters v. Seventeen Magazine, 195 Cal.App.3d 1119, 1122, 241 Cal.Rptr. 101, 103 (1987). SOF also alleges that payment of the jury's verdict would force the magazine to close and, consequently, would deprive public debate of SOF's protected, non-commercial speech. See Yuhas v. Mudge, 129 N.J.Super. 207, 209-10, 322 A.2d 824, 825 (1974).
 
 
 38
 The district court was sensitive to the need to reconcile Georgia's interest in imposing liability on publishers for printing advertisements related to criminal activity with the First Amendment's concern that state law not chill protected expression. Accordingly, the court instructed the jury to apply a "modified" negligence standard under which SOF had no legal duty to investigate the ads it printed. The district court stressed that the jury could find SOF negligent only if Savage's advertisement "on its face" would have alerted a reasonably prudent publisher that the "ad in question contained a clearly identifiable unreasonable risk, that the offer in the ad is one to commit a serious violent crime." For the reasons set out below, we conclude that the district court's "modified" negligence standard satisfied the First Amendment's interests in protecting the commercial and core speech at issue in this case.
 
 
 39
 Supreme Court cases discussing the limitations the First Amendment places on state defamation law indicate that there is no constitutional infirmity in Georgia law holding publishers liable under a negligence standard with respect to the commercial advertisements they print. In New York Times v. Sullivan, 376 U.S. at 279-80, 84 S.Ct. at 726, the Court held that the First Amendment interest in protecting discussion of matters of great public concern "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." However, in subsequent opinions, the Court has clearly stated that the First Amendment does not require this high level of protection for all speech in all contexts. In Gertz v. Robert Welch, Inc., 418 U.S. at 346, 94 S.Ct. at 3010, the Court held that, as long as a state does not impose liability without fault, it may constitutionally hold a publisher liable for "defamatory falsehood injurious to the reputation of a private individual." In light of the fact that the Court has found that a negligence standard satisfies the First Amendment's concern for the non-commercial, core speech at issue in Gertz, we see no constitutional infirmity in Georgia tort law holding publishers liable under a negligence standard with respect to the commercial advertisements they print. Cf. Pittsburgh Press, 413 U.S. at 388, 93 S.Ct. at 2560 (newspaper violated anti-discrimination ordinance where ad implied advertiser was "likely to discriminate against women in his hiring decisions") (emphasis added).
 
 
 40
 Past Supreme Court decisions indicate, however, that the negligence standard that the First Amendment permits is a "modified" negligence standard. The Court's decisions suggest that Georgia law may impose tort liability on publishers for injury caused by the advertisements they print only if the ad on its face, without the need to investigate, makes it apparent that there is a substantial danger of harm to the public. In Gertz, for example, the Court held that a state could impose liability on a publisher who negligently printed a defamatory statement whose substance made "substantial danger to reputation apparent." 418 U.S. at 348, 94 S.Ct. at 3011 (emphasis added); see also Pittsburgh Press, 413 U.S. at 387-88, 93 S.Ct. at 2560 (upholding municipal ordinance prohibiting newspaper from carrying sex-designated advertising columns because mere choice to advertise in sex-designated column implied advertiser likely to discriminate in hiring). Significantly, the Court noted that its inquiry would be different "if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." Gertz, 418 U.S. at 348, 94 S.Ct. at 3011; cf. Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 542-43, 17 L.Ed.2d 456 (1967) (in action for invasion of privacy, concern about "saddl[ing] the press with the impossible task of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait"). For cases reaching a similar conclusion, see Walters, 195 Cal.App.3d 1119, 241 Cal.Rptr. 101 (advertisement for tampons that caused toxic shock); cf. Pittman v. Dow Jones & Co., 662 F.Supp. 921 (E.D.La.), aff'd, 834 F.2d 1171 (5th Cir.1987) (fraudulent advertisement offering "jumbo" interest rates on deposits in Texas financial institutions); Yuhas, 129 N.J.Super. 207, 322 A.2d 824 (advertisement for defective fireworks).
 
 
 41
 Based upon the foregoing authorities, we conclude that the First Amendment permits a state to impose upon a publisher liability for compensatory damages[7] for negligently publishing a commercial advertisement where the ad on its face, and without the need for investigation, makes it apparent that there is a substantial danger of harm to the public. The absence of a duty requiring publishers to investigate the advertisements they print and the requirement that the substance of the ad itself must warn the publisher of a substantial danger of harm to the public guarantee that the burden placed on publishers will not impermissibly chill protected commercial speech. Cf. Hunter, 459 F.2d at 213 (where law prohibits advertisements that, on their face, communicate discriminatory preference in sale or rental of dwellings, publisher "can easily distinguish between permissible and impermissible advertisements"). Furthermore, these limitations on tort liability ensure that the burden imposed on publishers will have only a minimal impact on their advertising revenue, and, consequently, on their ability to publish non-commercial speech. Cf. id.[8]
 
 
 42
 We conclude that the instructions fashioned by the district court in this case properly reflect the "modified" negligence standard that the First Amendment permits. The court's instructions modified the ordinary negligence standard to relieve SOF of any duty to investigate the advertisements it prints. In addition, the instructions required that the language of the ad itself contain a clearly identifiable unreasonable risk of harm to the public. The instructions stated:
 
 
 43
 Plaintiffs must prove ... that a reasonable reading of the advertisement in this case would have conveyed to a magazine publisher, such as Soldier of Fortune, that this ad presented the clear and present danger of causing serious harm to the public from violent criminal activity. Plaintiffs must prove that the ad in question contained a clearly identifiable unreasonable risk, that the offer in the ad is one to commit a serious violent crime, including murder.
 
 
 44
 Now, while defendants owe a duty of reasonable care to the public, the magazine publisher does not have a duty to investigate every ad it publishes. Defendants owe no duty to the plaintiffs for publishing an ad if the ad's language on its face would not convey to the reader that it created an unreasonable risk, that the advertiser was available to commit such violent crimes as murder.
 
 
 45
 Thus, the instructions in this case expressly relieved SOF of any duty to investigate the ad, expressly instructed the jury to determine liability on the basis of the language of the ad on its face, and, finally, expressly instructed the jury that the risk of harm to the public must be clearly identifiable.[9] We conclude that these instructions satisfy the First Amendment requirement articulated above that the ad on its face must make it apparent that there is a substantial danger of harm to the public.[10]
 
 3. Independent First Amendment Review
 
 46
 Having determined that the district court properly instructed the jury regarding a publisher's duty to the public under Georgia law, we now turn to SOF's argument that the jury erred in applying that law when it found that SOF owed a duty to appellees to refrain from publishing the Savage ad. Ordinarily, "[i]n reviewing a jury's verdict, ... a court is not entitled to weigh the evidence anew," but merely examines the record for "evidence substantial enough to support the jury's verdict." Lindsey v. American Cast Iron Pipe Co., 772 F.2d 799, 801 (11th Cir.1985). However, the Supreme Court has held that, in cases involving First Amendment claims, an appellate court must undertake independent review of the record "in order to make sure that 'the [trial court's] judgment does not constitute a forbidden intrusion on the field of free expression.' " Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting New York Times, 376 U.S. at 285, 84 S.Ct. at 729);[11] see also Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 n. 9 (11th Cir.1987), cert. denied, 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988). In order to guarantee that the jury imposed no greater burden on SOF than the Constitution permits, we subject to independent examination the jury's finding that Savage's ad, on its face, would convey to a reasonably prudent publisher that it created a clearly identifiable unreasonable risk that the advertiser was available to commit serious violent crimes.
 
 
 47
 Our review of the language of Savage's ad persuades us that SOF had a legal duty to refrain from publishing it. Savage's advertisement (1) emphasized the term "Gun for Hire," (2) described Savage as a "professional mercenary," (3) stressed Savage's willingness to keep his assignments confidential and "very private," (4) listed legitimate jobs involving the use of a gun--bodyguard and courier--followed by a reference to Savage's "other special skills," and (5) concluded by stating that Savage would consider "[a]ll jobs." The ad's combination of sinister terms makes it apparent that there was a substantial danger of harm to the public. The ad expressly solicits all jobs requiring the use of a gun. When the list of legitimate jobs--i.e., body guard and courier--is followed by "other special skills" and "all jobs considered," the implication is clear that the advertiser would consider illegal jobs. We agree with the district court that "the language of this advertisement is such that, even though couched in terms not explicitly offering criminal services, the publisher could recognize the offer of criminal activity as readily as its readers obviously did." Braun v. Soldier of Fortune, 749 F.Supp. 1083, 1085 (M.D.Ala.1990).[12]
 
 
 48
 We emphasize that we are not adopting a per se rule that all advertisements using terms such as "Gun for Hire" present a clearly identifiable unreasonable risk of harm to the public from violent criminal activity. An advertiser certainly could use such terms in a metaphoric or humorous manner that would not indicate a clear risk of substantial danger to the public. However, viewing the advertisement that Savage submitted to SOF in its entirety, we conclude that the ad on its face makes it apparent that there was a substantial danger that Savage was soliciting illegal jobs involving the use of a gun. Thus, the First Amendment standard articulated above was satisfied.
 
 B. Proximate Cause
 
 49
 SOF's sole remaining claim[13] is that the jury erred in finding that SOF's publication of Savage's ad was the proximate cause of appellees' injuries. SOF argues that the events that intervened between its publication of Savage's ad and the carrying out of the murder plot were entirely unforeseeable and, therefore, that SOF's publication of Savage's ad was too remote in the chain of events leading to appellees' injuries for the jury to hold SOF liable. Since the proximate cause issue does not implicate any constitutional values, we review the jury's factual finding under the traditional standard of deference to the fact finder. See Bose Corp., 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31.
 
 
 50
 We find that the jury had ample grounds for finding that SOF's publication of Savage's ad was the proximate cause of appellees' injuries. Georgia law recognizes that, "[g]enerally, the intervening criminal act of a third party, without which the injury would not have occurred, will be treated as the proximate cause of the injury, superseding any negligence of the defendant...." Rosinek v. Cox Enterprises, Inc., 166 Ga.App. 699, 305 S.E.2d 393, 394 (1983). If, however, "the criminal act was a reasonably foreseeable consequence of the defendant's conduct, the casual connection between that conduct and the injury is not broken." 305 S.E.2d at 394-95; see also Craine v. United States, 722 F.2d 1523, 1525 (11th Cir.1984). We have already held that the language of Savage's ad should have alerted a reasonably prudent publisher to the clearly identifiable unreasonable risk that Savage was soliciting violent and illegal jobs. It follows that a reasonable jury could conclude that the criminal act that harmed appellees was reasonably foreseeable and, accordingly, that the chain of causation was not broken.
 
 
 51
 For the foregoing reasons, we AFFIRM the district court's judgment.
 
 
 52
 AFFIRMED.
 
 ESCHBACH, Senior Circuit Judge, dissenting:
 
 53
 This case poses a difficult and specific question of law for which we have little guidance. The First Amendment imposes strict limits on states' ability to subject publishers to tort liability for defamations they publish. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). While this case is broadly analogous in that it involves constitutional restrictions on state tort law as applied to publishers, it presents a number of tortuous twists. We must determine whether the First Amendment limits states' ability to subject publishers to tort liability for wrongful death actions where the wrongful death was facilitated by a third-party's commercial speech for which the publisher provided a forum or billboard. The majority's thorough opinion does a remarkable job of tackling this unique question, and I fully agree with its imaginative interpretation of scant precedent. Nevertheless, I differ with the majority's application of the law to the facts of this case. Specifically, in discharging our duty of independent first amendment review of the language of Savage's ad, see ante at 1121-1122, I remain convinced that the language of the advertisement is ambiguous, rather than patently criminal as the majority believes. And although the majority has carefully culled the legal standards it applies from the jury instructions, I remain concerned over whether the instructions were clear enough that the jury could have done so as well. Because of the confluence of these two concerns--the ambiguity of both the advertisement and the jury instructions--I am not confident that the jury actually found that this advertisement was a clear solicitation for criminal activity. Under these circumstances, I am unable to uphold the crushing third-party liability the jury has imposed on Soldier of Fortune Magazine. I respectfully dissent.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 National magazines like Time and Newsweek carried some of these stories. Others were reported in local newspapers published in and around Boulder, Colorado, the city in which SOF is based
 
 
 [2]
 Appellees presented evidence that SOF subscribed to a clipping service that culled articles mentioning SOF from hundreds of newspapers and magazines. SOF maintained a multi-volume collection of these articles which was introduced into evidence. These volumes contained none of the articles appellees introduced as evidence that SOF personal service classified ads were linked to criminal activity
 
 
 [3]
 Appellees also argue that Eimann is distinguishable from the present case because the advertisement at issue in Eimann was "facially innocuous" and "ambiguous in its message" while Savage's advertisement clearly conveyed that the advertiser was "ready, willing and able" to use his gun to commit crimes. Brief for Appellees at 27. We agree. The advertisement in Eimann merely listed the advertisers' qualifications and indicated a willingness to accept risky assignments in the United States or overseas. Unlike Savage's ad, the ad in Eimann did not contain language that would alert a reasonable publisher to the clearly identifiable unreasonable risk that the advertisers were offering criminal services. See infra part III.A.3 (analysis of Savage's ad)
 
 
 [4]
 It is possible that the district court's use of the phrase "clear and present danger" may have resulted in the jury applying a standard more demanding than the "modified" negligence standard articulated in the text below. See infra part III.A.2. Because we believe that the district court's instruction--that plaintiffs must prove that Savage's ad on its face, without the need for investigation, contained a "clearly identifiable unreasonable risk" of harm to the public--satisfied both Georgia law and the First Amendment, see id., we need not discuss whether the district court's "clear and present danger" instruction actually required plaintiffs to satisfy a stricter standard
 
 
 [5]
 In New York Times, the Supreme Court held that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil [tort] law." 376 U.S. at 277, 84 S.Ct. at 724. This conclusion recognized that "[t]he fear of damage awards under [state tort law] may be markedly more inhibiting than the fear of prosecution under a criminal statute." Id., 84 S.Ct. at 724
 
 
 [6]
 Georgia courts have been sensitive to the need to take into consideration First Amendment values when defining the scope of Georgia's tort remedies. See, e.g., Walt Disney Productions, Inc. v. Shannon, 247 Ga. 402, 276 S.E.2d 580 (1981) (limiting recovery for personal injury); Cox Broadcasting Corp. v. Cohn, 231 Ga. 60, 200 S.E.2d 127, 131 (1973), rev'd, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (attempting to resolve "head-on collision between the tort of public disclosure and First Amendment rights of freedom of speech and press")
 
 
 [7]
 The Supreme Court's decisions indicate that a different rule would apply to presumed damages or punitive damages. Gertz, 418 U.S. at 348-50, 94 S.Ct. at 3011-12
 
 
 [8]
 As for SOF's argument that the district court's judgment would force the magazine out of business and, thus, silence its protected speech, we observe that the Supreme Court has squarely rejected the notion that the First Amendment interest in protected speech requires that "publishers and broadcasters enjoy an unconditional and indefeasible immunity from [tort] liability." Gertz, 418 U.S. at 341, 94 S.Ct. at 3007
 
 
 [9]
 We recognize that the second paragraph of the instructions quoted immediately above in the text refers to the ad's language on its face as creating an "unreasonable risk" of harm without prefacing that term with the term "clearly identifiable," as was done in the immediately preceding paragraph of the instructions. In this case, we need not decide whether an instruction that states merely that the ad on its face must convey to the reader that the ad created an unreasonable risk of harm to the public satisfies the First Amendment requirement that the ad on its face make it apparent that there is a substantial danger of harm to the public. The First Amendment limitation may well be satisfied because the risk of harm must be conveyed by the language of the ad on its face and because the risk of harm must be unreasonable. However, that question need not be decided in this case because we are convinced that the instructions considered as a whole conveyed to the jury that the plaintiff must prove that the ad in question contained a clearly identifiable unreasonable risk of harm to the public
 
 
 [10]
 SOF's argument that the district court's instructions placed a duty upon it to reject ambiguous advertisements is without merit since the court's instructions required a clearly identifiable unreasonable risk of harm. As noted above, this aspect of the instructions also distinguishes this case from Eimann v. Soldier of Fortune, Inc., 880 F.2d 830 (5th Cir.1989), cert. denied, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990)
 
 
 [11]
 In Bose Corp., 466 U.S. at 505, 104 S.Ct. at 1962, the Supreme Court noted that, in cases in which it is contended that the communication at issue is within a class of unprotected speech, "the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." It further observed that "[p]roviding triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas." Id., 104 S.Ct. at 1962 (footnote omitted). Accordingly, the Court stressed that "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." Id. at 501, 104 S.Ct. at 1959
 
 
 [12]
 The undisputed evidence that the overwhelming majority of the calls Savage received in response to his ad were solicitations for criminal activity undermines SOF's argument that appellees presented no evidence that a reasonably prudent publisher should have recognized that Savage's ad posed a clearly identifiable unreasonable risk that it was an offer to commit crimes for money. As the Fourth Circuit noted in United States v. Hunter, 459 F.2d at 213, a publisher can divine an advertiser's intent to violate the law "as well as any of its readers."
 
 
 [13]
 Gertz, 418 U.S. at 348-50, 94 S.Ct. at 3011-12, indicates that punitive damages are recoverable only upon satisfaction of the actual malice standard set out in New York Times v. Sullivan. However, we decline to address SOF's argument in its reply brief that the evidence does not support the jury's verdict awarding punitive damages. The waiver rule requires that an appellant state and address in its initial brief the issues for appellate review "because '[i]n preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed.' " Federal Sav. and Loan Ins. Corp. v. Haralson, 813 F.2d 370, 373 n. 3 (11th Cir.1987) (quoting Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir.1983)); see also Fed.R.App.P. 28(a). SOF did not mention the punitive damages issue in its initial brief on appeal, and, therefore, we find that SOF has waived its right to contest the grant of punitive damages. In addition, we note that SOF's challenge to the punitive damages award consisted merely of a cursory argument in a footnote of its reply brief and that, at oral argument, SOF's counsel expressly stated that SOF had no interest in the punitive damages issue since SOF believed that the compensatory damages alone would drive appellants out of business