In re COUNTY OF ORANGE, a political subdivision of the State of California, Debtor.

COUNTY OF ORANGE, a political subdivision of the State of California, Plaintiff,

v.

McGRAW–HILL COMPANIES, INC., a New York Corporation, d/b/a Standard & Poor's Ratings Services, its unincorporated division, Defendant.

Bankruptcy No. SA 96–22272 JR.
Adv. No. SA 96–1624 JR.

United States Bankruptcy Court,
C.D. California.

Dec. 5, 1996.

Michael J. Hennigan of Hennigan, Mercer & Bennett, Los Angeles, CA, for County of Orange.

Geoffrey L. Thomas of Paul, Hastings, Janofsky & Walker, Los Angeles, CA, for The McGraw–Hill Companies, Inc., d/b/a Standard & Poor's Ratings Services.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Plaintiff County of Orange (the "County") filed a complaint (the "Complaint") against Defendant McGraw–Hill Companies, Inc., dba Standard & Poor's Rating Services ("S & P") alleging three counterclaims: breach of contract, professional negligence, and aiding and abetting breach of a fiduciary duty.

S & P filed a motion (the "Motion") to dismiss the Complaint.

After briefing by the parties and oral arguments, I took the matter under submission.

## JURISDICTION

This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) (1996) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (1996) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district), and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings arising in the Central District of California to the bankruptcy judges for the Central District of California). Pursuant to 28 U.S.C. § 157(b)(3) (1996), I determine that this matter is a non-core proceeding.

## STATEMENT OF FACTS

On December 6, 1994, the County filed its chapter 9 bankruptcy petition.

On June 9, 1995, S & P filed a proof of claim (the "Claim") in the County's bankruptcy asserting an unsecured, nonpriority claim for $65,000. On June 11, 1996, the County filed the Complaint against S & P denying the Claim and asserting three counterclaims: breach of contract, professional negligence, and aiding and abetting breach of a fiduciary duty.

On August 12, 1996, S & P filed with the United States District Court a motion to withdraw the reference in the adversary proceeding (the "Reference Motion").

On August 29, 1996, S & P filed the Motion. In the Motion, S & P alleges that the County has failed to state any claim upon which relief can be granted; therefore, this court should dismiss the Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7012. Alternatively, S & P asks this court to dismiss the Complaint for failure to state claims with the required particularity under FRCP 9(b), made applicable to adversary proceedings pursuant to FRBP 7009.

On August 30, 1996, S & P filed a motion to withdraw the Claim (the "Withdrawal Motion"). On October 2, 1996, after oral arguments, I took the Withdrawal Motion under submission. In a separate memorandum opinion, entered December 2, 1996, I granted the Withdrawal Motion.[1]

---

1. Since I granted the Withdrawal Motion, the County's three affirmative claims in the Complaint for disallowance of the Claim under § 502(b) of the Bankruptcy Code (the "Code"), for setoff under Code § 502(b), and for equitable subordination under Code § 510(c)(1) are moot. Accordingly, the three affirmative claims in the Complaint are dismissed.

The County also asserts three counterclaims in the Complaint. Given the withdrawal of the

On October 17, 1996, the district court granted the Reference Motion; however, the district court noted that the withdrawal shall become effective upon the issuance of this court's written opinion on the Motion.[2]

## PROPER LEGAL STANDARD

All allegations of fact in the Complaint are assumed to be true and are considered in a light most favorable to the County. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994); *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46 (9th Cir.1988); *Western Reserve Oil and Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 773 (1986); *Love v. United States,* 915 F.2d 1242, 1245 (9th Cir. 1989); *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir.1986); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). "It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir.1986) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1969)).

S & P can only prevail on the Motion if it appears beyond all doubt that the County can prove *no* set of facts in support of their claims that would entitle the County to relief. *Arcade Water Dist. v. United States,* 940 F.2d 1265, 1267 (9th Cir.1990); *Gibson,* 781 F.2d at 1337 (quoting *Conley,* 355 U.S. at 45, 78 S.Ct. at 101–02). A FRCP 12(b)(6) motion may not be used to resolve a contest about the facts or the merits of a case. 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1356 (1990) (citing *Murray v.*

*Amoco Oil Co.,* 539 F.2d 1385, 1387 (5th Cir.1976)).

## DISCUSSION

### I. ALLEGED FACTS IN THE COMPLAINT MUST BE CONSIDERED TRUE FOR THE PURPOSES OF THE MOTION.

There are numerous, complex facts asserted in the Complaint that must be treated as true for the purposes of the Motion. *Clegg,* 18 F.3d at 754; *Western Reserve Oil,* 765 F.2d at 1430.

In the Complaint, the County alleges that beginning in the summer of 1991 through December 6, 1994, the date the County filed bankruptcy, former County Treasurer Robert L. Citron committed the financial portfolio under his control to an investment strategy that was dependent on interest rates remaining low. Compl. ¶¶ 9, 70 & 76.[3]

The County states that Citron's investment strategy used the proceeds of short-term borrowings and other moneys to invest in long-term securities. In many cases, these long-term securities were highly-volatile derivatives. Through reverse repurchase agreements, these long-term securities were pledged to borrow additional moneys. Compl. ¶¶ 10, 71–74 & 76.

From 1992 through 1993, this investment strategy enabled Citron to realize extraordinary profits on Pool investments. Compl. ¶¶ 11 & 77. Fearing that the magnitude of these profits might cause alarm about his investment strategy or create unrealistic expectations, Citron and his assistant, Matthew

Claim, the counterclaims in the Complaint are now affirmative claims against S & P. *See* Compl. ¶ 171 ("should this Court determine that M–H [S & P] has not asserted a claim against the County or its property, either formally or informally, and that as a result, the County cannot assert 'counterclaims,' the County, regardless of whether such causes of action are therefore core, brings all of the following counterclaims as claims against M–H [S & P]").

2. *See* Order Granting Motions to Withdraw the Reference, United States District Court, Judge Taylor, October 17, 1996, at n. 1 ("In case SACV 96–765 GLT, *County v. Mc Graw Hill,* the withdrawal shall take effect upon the filing of the

bankruptcy court's ruling on the argued and submitted motion to dismiss, or upon further order of this court."). *See also* Civil Minute Order of October 30, 1996 re Defendant's Request for Clarification, United States District Court, Judge Taylor ("As the footnote states, the bankruptcy court is to go ahead and rule on the submitted motion to dismiss and the withdrawal will take effect after that ruling is filed.").

3. This investment portfolio included County moneys and money given to Citron by other municipal agencies ("Pool Participants"). The overall portfolio was commonly referred to as the Orange County Investment Pool (the "Pool"). Compl. ¶¶ 9 & 38.

Raabe, as part of a fraudulent effort to manage the expectations of Pool Participants, diverted some of the interest earnings from Pool Participants to the County. Compl. ¶¶ 11 & 77.

In early February 1994, when interest rates began to rise, the Pool suffered horrendous losses in the market value of the Pool assets. Compl. ¶¶ 12 & 78–79. By March 1994, the rising interest rates and Pool losses seriously threatened the financial viability of the Pool; therefore, Citron concluded that a massive infusion of new cash was needed if he was going "to maintain competitive yields with other investment alternatives, while at the same time publicly reaffirming the safety and integrity of the Pool and maintaining the confidence and support of Pool Participants and lenders." Compl. ¶ 13; see also Compl. ¶¶ 78–79.

Citron and Raabe created a plan to deal with the impending crisis. Compl. ¶¶ 80 & 126. Under their plan, the County would raise massive amounts of new cash by issuing short-term, tax-exempt notes. The proceeds from these new short-term notes would be used to purchase five-year securities with higher yields. Compl. ¶¶ 14, 80–81. The County states that:

> [b]y 'doubling-down' the interest rate bet in that manner, Citron and Raabe hoped to obtain enough additional securities to forestall the snowballing of the forced sale of securities and to begin to earn enough 'spread' to reestablish the future competitiveness of the Pool's yield, and thereby to provide an illusion of liquidity that would allow them to publicly maintain that the Pool was safe and sound.

Compl. ¶ 14.

According to the County, the flaw in the plan was that if the interest rates continued to rise, the County and the Pool assets would be exposed to even greater risks. Compl. ¶¶ 15, 84 & 126. The County alleges that despite the high risks associated with the strategy, Citron and Raabe were determined to press ahead with their plan. Compl. ¶ 15.

In 1993 and 1994, Citron and Raabe retained S & P to render bond rating and investment services to the County in support of new debt offerings. Compl. ¶¶ 16 & 93. "These debt offerings were designed and intended by Citron and Raabe at first to implement their enormous interest rate bet and then later, in 1994, to greatly expand its scope in an increasingly desperate effort to prevent Pool Participants, the [Orange County] Board of Supervisors and the public from appreciating the deteriorated and deteriorating condition of the Pool." Compl. ¶ 16.

Under the terms of S & P's contract with the County, S & P was required to render bond rating and investment services to the County that were competent, honest, and not deceptive. Compl. ¶ 17. With respect to each debt offering made by the County in 1993 and 1994, S & P entered into a contract called a "Memorandum of Agreement—re Municipal Debt Contract Ratings" ("MOA"). Compl. ¶ 89.

The County contends that S & P breached the MOAs. Compl. ¶¶ 17–18, 89–92, 140–53 & 172–76.

> [From 1993–94, S & P] provided analysis and ratings services to the County, both publicly and privately, for large debt security issues. These analyses and ratings wrongly represented and concluded that the County's financial condition and ability to repay such debts were fundamentally sound and safe, and that the County's 1993 and 1994 debt issues could and would be repaid in accordance with their terms.

Compl. ¶ 18; see also Compl. ¶¶ 89–91.

S & P's ratings, information, and analysis were important factors in the County's decision to issue its 1993 and 1994 debt securities. Compl. ¶¶ 18, 83 & 137. Without S & P's ratings, information, and analysis, the County would not have wanted or been able to market its debt securities in 1993 and 1994. Compl. ¶ 18.

The County alleges that S & P committed professional negligence. Compl. ¶¶ 18–19, 88, 96–106, 140–53 & 177–79. "If provided with timely and accurate services by S & P in accordance with its contractual and professional obligations, the County would have been able to avoid compounding the financial problems created by Citron and Raabe and to undertake immediate corrective action to

moderate or avoid prospective massive losses of public funds." Compl. ¶¶ 18 & 151–53.

The County further alleges that during the ratings process in 1993 and 1994, S & P knew or recklessly disregarded facts showing that the debt bond offerings were inappropriate and unsound. Compl. ¶¶ 19, 96–106, 127–33 & 140–53. Additionally, according to the County, S & P either knew, or in the exercise of professional care should have known, that the California State Constitution and other statutory restrictions prohibited Citron and Raabe from proceeding with their speculative and risky strategy. Compl. ¶¶ 19 & 88.

The County also contends that S & P knew or recklessly disregarded that the actions of Citron and Raabe were in violation of their fiduciary duty to the County. Compl. ¶¶ 19 & 133–34. Further, S & P knew that its advice, information, ratings, and support of the debt securities were important and material to the ability of Citron and Raabe to complete these transactions. Compl. ¶¶ 19, 92 & 136–37.

The County alleges that S & P materially and wrongfully aided and abetted Citron and Raabe in breaching their fiduciary duties to the County by improperly rating the County's 1993 and 1994 debt securities and by providing the County with incompetent, false, and misleading information and analysis. Compl. ¶¶ 19, 127–33, 134, 151–53 & 180–86.

If S & P had complied with its contractual and professional obligations, the County would have known:

a. that Citron and Raabe had misrepresented the safety of the County's investment portfolio . . .

b. that the equity and liquidity of the County were at extreme risk from rising interest rates;

c. that Citron and Raabe's plan in 1994 to expand the scope of the interest rate bet to which they intended to commit the County and the Pool threatened major additional losses;

d. that relying upon the assets of the County, particularly its investment portfolio, as a source of repayment upon bond maturity was extremely risky and imprudent.

Compl. ¶ 20; *see also* Compl. ¶¶ 151–53.

The County contends that if S & P had revealed any significant portion of the material facts and risks that it was aware of, the County would have taken the appropriate steps to terminate the offerings, stop Citron's purchasing of long-term securities, and restructure the Pool. Compl. ¶¶ 21 & 151–53. Moreover, if S & P had disclosed this information, the County could have avoided approximately $500 million of the County's $1.8 billion loss that the County suffered. Compl. ¶¶ 22, 151–53 & 186.

■ For the purposes of the Motion, these factual allegations must be treated as true. Any reasonable inference based on these allegations must also be construed in a light most favorable to the County. *Arcade Water Dist.*, 940 F.2d at 1267.

## II. S & P IS NOT ENTITLED TO DISMISSAL OF THE COUNTY'S CLAIMS BASED ON THE FIRST AMENDMENT.

In the Motion, S & P argues that "the central defect with the County's Complaint is that it disregards the constitutional requirements that must be observed by any party trying to recover on such claims against a publisher." S & P's Mot. Dismiss Pls.' Compl. at 6. In essence, S & P asserts that because it is a financial publisher, it is entitled to certain First Amendment protections. Specifically, S & P contends that the County must plead that S & P acted with actual malice (*i.e.*, that S & P either knowingly published false information or published such information with reckless disregard for the truth). S & P cites several cases for the proposition that it is entitled to First Amendment protections. *See, e.g., In re Pan Am Corp.*, 161 B.R. 577, 580–84 (S.D.N.Y.1993); *McGraw–Hill, Inc. v. States of Arizona (In re Petroleum Prod. Antitrust Litig.)*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982).

The County responds by stating that the First Amendment does not insulate publishers from liability for breach of contract. *See,*

*e.g., Cohen v. Cowles Media Co.,* 501 U.S. 663, 672, 111 S.Ct. 2513, 2519–20, 115 L.Ed.2d 586 (1991); *Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972); *Associated Press v. United States,* 326 U.S. 1, 51, 65 S.Ct. 1416, 1438–39, 89 L.Ed. 2013 (1945). Additionally, the County argues that courts "have recognized that publishers can agree to provide services other than 'publication' and that publishers can be held liable for negligently performing such services." Opp. S & P's Mot. Dismiss at 10 (citing *Braun v. Soldier of Fortune Magazine, Inc.,* 968 F.2d 1110, 1118 (11th Cir.1992)). *See also District 65, U.A.W. v. Harper & Row, Publishers, Inc.,* 576 F.Supp. 1468, 1480 (S.D.N.Y.1983).

▮ I agree with the County that S & P's publisher status does not provide First Amendment protection as to all S & P's activities. Under the circumstances here, the County does not have to plead actual malice in order to maintain its claims for breach of contract, professional negligence, and aiding and abetting breach of a fiduciary duty.

The seminal case regarding First Amendment protection for a publisher is *The New York Times Company v. Sullivan,* 376 U.S. 254, 278, 84 S.Ct. 710, 724–25, 11 L.Ed.2d 686 (1964). In writing for the majority, Justice Brennan stated:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.* at 279–80, 84 S.Ct. at 726. Later, the Supreme Court extended the standard of knowing or reckless falsehood to situations involving persons other than public officials. *Time, Inc. v. Hill,* 385 U.S. 374, 390, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967) ("We find applicable here the standard of knowing or reckless falsehood, not through blind application of *New York Times Co. v. Sullivan,* relating solely to libel actions by public officials, but only upon consideration of the fac-

tors which arise in the particular context of the application of the New York statute in cases involving private individuals.").

In *Hill,* the Court applied the standard in a lawsuit against Life magazine for the publication of an article about a play depicting a kidnaping ordeal suffered by the Hill family. *Id.* at 377–78, 87 S.Ct. at 536–37. The Court stated that "[t]he guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government." *Id.* at 388, 87 S.Ct. at 542. The Court further concluded that "[i]n this context, sanctions against either innocent or negligent misstatement would present a grave hazard of discouraging the press from exercising the constitutional guarantees." *Id.* at 389, 87 S.Ct. at 543.

The County accepts S & P's publisher status and its right to assert First Amendment protections when publishing its ratings. Clearly, the publication of security ratings provides a public service to the investment community and is a matter of public interest. However, First Amendment protection is not without limits.

In *Cohen,* the Supreme Court specifically addressed the issue of limits on First Amendment protections. *Cohen,* 501 U.S. at 670, 111 S.Ct. at 2518–19. In deciding whether the Minnesota doctrine of promissory estoppel could be applied against a member of the press, the court held:

> [i]t is, therefore, beyond dispute that '[t]he publisher of a newspaper has no special immunity from the application of general laws'.... Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations. There can be little doubt that the Minnesota doctrine of promissory estoppel is a law of general applicability. It does not target or single out the press. Rather, insofar as we are advised, the doctrine is generally applicable to the daily transactions of all citizens of Minnesota. The First Amendment does not forbid its application to the press.

*Id.* (citations omitted) (emphasis added).[4]

Like the situation in *Cohen,* the laws which the County alleges S & P violated are laws of general applicability. They do not specifically target or single out the press; therefore, the First Amendment does not forbid their application to S & P. *See also Landsberg v. Scrabble Crossword Game Players, Inc.,* 802 F.2d 1193, 1198 (9th Cir.1986) (publisher held liable for breaching an implied contract to pay for use of a manuscript).

█ S & P argues that *Cohen* is inapplicable because the County is not claiming that "S & P failed to provide a rating. The County is instead complaining about the accuracy of the rating that S & P provided; in other words, it is complaining about what S & P said, *i.e.,* the *content* of S & P's speech. According to the County, S & P published 'false' or 'erroneous' ratings, and as a result, the County was injured." Reply S & P Supp.Mot. Dismiss Pls.' Compl. at 4 (emphasis in original).

S & P's argument is off target. The County is not complaining about what S & P published. Rather, it complains that S & P did not fulfill its specific obligations under the MOAs. According to the County, S & P was retained to analyze and assess the creditworthiness of the County and its security offerings and provide the County with investment services. S & P was to prepare the ratings and other information communicated to the County in an accurate and honest manner. *See* Compl. ¶¶ 89–100. The Complaint quotes from the MOAs as follows:

> [t]he fee is based on the time and effort to determine the rating and accrues upon completion or termination of the rating process and is not contingent upon the sale of the bonds or debt obligations. **The fee is not a payment to circulate, disseminate or publicize the rating.**
>
> . . . . .
>
> A Standard & Poor's corporate or municipal debt rating is a current assessment of the credit worthiness of an obligor with respect to a specific obligation.

Compl. ¶ 89 (emphasis added).[5]

Contrary to what S & P suggests, the County does not attack the publication or accuracy of the published rating. It seeks recovery for S & P's alleged failure to provide it with an accurate rating for the County's review in evaluating whether to proceed with its note offerings. According to the County, if it had been given an accurate rating, it would not have gone forward with the offerings, thereby avoiding substantial losses caused by the risky investment policies of Citron and Raabe. *See* Compl. ¶¶ 21 & 151–53. Based on the allegations in the Complaint, the County's claim for breach of contract is independent of any speech that is protected by the First Amendment.

At least one other court has specifically rejected S & P's First Amendment argument. In *In re Taxable Mun. Bond Sec.*

---

**4.** In *Cohen,* the Court noted that its decision fell into a "well established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report news." *Cohen,* 501 U.S. at 669, 111 S.Ct. at 2518. *See, e.g., Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972) (First Amendment does not relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena); *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576–79, 97 S.Ct. 2849, 2857–59, 53 L.Ed.2d 965 (1977) (the press, like others interested in publishing, may not publish copyrighted material without obeying copyright law); *Associated Press v. Nat'l Labor Relations Bd.,* 301 U.S. 103, 130–31, 57 S.Ct. 650, 654–55, 81 L.Ed. 953 (1937) (media must follow and obey the National Labor Relations Act); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 192–93, 66 S.Ct. 494, 497–98, 90 L.Ed. 614 (1946) (media must follow and obey the Fair Labor Standards Act); *Associated Press v. United States,* 326 U.S. 1, 51, 65 S.Ct. 1416, 1438–39, 89 L.Ed. 2013 (1945) (the press can "claim no immunity from the application of general laws" and must not restrain trade in violation of the antitrust laws); *Murdock v. Pennsylvania,* 319 U.S. 105, 112, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943) (press must pay non-discriminatory taxes); *See also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 581–83, 103 S.Ct. 1365, 1369–71, 75 L.Ed.2d 295 (1983).

**5.** S & P challenges the County's interpretation of the MOAs and argues that solely by providing a rating, it fulfilled any obligation under its contracts with the County. This may be true; however, this is a question that needs to be resolved beyond the pleading stage.

*Litig.*, 1993 WL 591418 (E.D.La.1993), S & P made the same argument to the district court in relation to a third-party complaint against it for contribution and indemnity in connection with a bond issuance. *Id.* at *1–4. The court held:

> First, S & P argues that .because the ratings on which the third-party plaintiffs base their claims were published, they are protected by the First Amendment's guarantee of freedom of the press and therefore any claims for contribution and indemnity are precluded. Although S & P's publications may be afforded some protection under the First Amendment as commercial speech, the allegations in the third-party complaint are that S & P **contracted to provide services in connection with each of the bond issues** and knew that its ratings would be disseminated to the public as part of the official statements, and S & P therefore played an active role in the dissemination of the allegedly fraudulent official statements. The dissemination of information through an official statements is subject to statutory and common law restrictions, including those of Section 10(b) and Rule 10b–5. **Neither S & P's membership in the 'financial media' nor its publication of the bond ratings through its press media shields it from generally applicable laws.** *Cohen v. Cowles Media Co.,* [501 U.S. 663, 668–70] 111 S.Ct. 2513, 2518 [115 L.Ed.2d 586] (1991). S & P stands in no better position from the perspective of the First.Amendment defenses than any other participant in the bond transactions.

*Id.* at *3 (footnote omitted) (emphasis added).

In response, S & P cites *Pan Am Corp.,* 161 B.R. at 580–84, and *Petroleum Prod. Antitrust Litig.,* 680 F.2d at 6–7, for the proposition that several courts have upheld First Amendment protections for publishers of financial and business information. These cases are distinguishable from the situation here. Both cases involved protecting the confidentiality of journalists' sources.

In *Pan Am,* the debtor, Pan Am Airlines, sought documents, correspondence, and other communications between Delta Airlines and S & P regarding Delta's decision not to fund Pan Am's reorganization. *Id.* at 579. S & P was not accused of any wrongdoing. In reversing the bankruptcy court, the district court held that S & P functions as a journalist when gathering information in connection with its ratings process and the journalist privilege applied to protect not only the information which it intended to publish but · also unpublished resource material. *Id.* at 581–82.

In *Petroleum Prod. Antitrust Litig.,* the court held that a publishing entity need not reveal the identity of its confidential sources. *Petroleum Prod. Antitrust Litig.,* 680 F.2d at 6–7. The court upheld the principle of protecting the confidential sources of reporters unless the information is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Id.* at 7–8 (citing *Baker v. F & F Inv.,* 470 F.2d 778, 783–85 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973)).

This court is not being asked to apply the journalist privilege here. The journalist privilege cases usually involve requests by third parties for confidential information that is developed during the investigative phase. The courts have recognized the importance of protecting these sources of information that are critical for a free press. The same concerns do not exist when a publisher acts under contract to perform certain services and provide specific information. Application of the journalistic privilege in that situation would nullify the very purpose and benefits of the contract. This makes no sense and highlights the necessity for imposing some limits on First Amendment protections.

As for the other cases cited by S & P,[6] those cases all involve either a libel or defa-

---

6. *See, e.g., Blatty v. New York Times Co.,* 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988) (intentional interference with prospective economic advantage subject to actual malice standard) (quoting *Read-*

*er's Digest Ass'n v. Superior Court,* 37 Cal.3d 244, 265, 208 Cal.Rptr. 137, 690 P.2d 610 (1986) (intentional infliction of emotional distress and "false light" invasion of privacy subject to actual malice standard)); *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057–58 (9th Cir.1990); *Crane v. Ari-*

mation action where the plaintiff is suing the publisher for false statements of fact that caused the defendant injury. None are related to a specific breach of contract claim or other independent action based on general applicable law.

Regarding the professional negligence and aiding and abetting claims, the same analysis applies. These claims also involve laws of general applicability. The Complaint asserts that S & P committed professional negligence in performing its duties and responsibilities under the contract. See Compl. ¶¶ 18–19, 88, 96–106, 140–53 & 177–79. According to the County, if S & P had performed its analytical services in accordance with applicable professional standards, the County would not have proceeded with the offerings that resulted in substantial losses to the County. See Compl. ¶¶ 21 & 151–53. Again, this claim is independent of the publication of the rating.

As for the aiding and abetting claim, the County asserts that S & P aided Citron and Raabe in breaching their fiduciary duty to the County. See Compl. ¶¶ 19, 127–33 & 180–86. S & P allegedly did this by not disclosing to the County that Citron was violating his position of trust. According to the County, S & P learned this information while performing its contractual duties under the MOAs. As with the other claims, this claim is not based on what S & P published. It deals with what S & P did to further the alleged illegal activities of Citron and Raabe.

In summary, with respect to each cause of action, the County has asserted claims independent of S & P's decision to publish its ratings. The claims do not attack the content of the published ratings; rather, the claims address specific actions by S & P that the County alleges injured it and its citizens. Accordingly, S & P is not entitled to require the County to plead "actual malice" in order to maintain its claims. The Motion to dismiss based on First Amendment protections is, therefore, denied.

*zona Republic,* 729 F.Supp. 698, 711 (C.D.Cal. 1989), *aff'd in part & remanded in part on other*

## III. THE COUNTY HAS SUCCESSFULLY PLED A BREACH OF CONTRACT ACTION.

In the Motion, S & P further argues that the County's breach of contract action should be dismissed, because: (1) S & P fulfilled any contract it had with the County as memorialized in the MOAs; (2) the County failed to allege performance of its obligations under the MOAs; and (3) the County failed to allege that S & P breached any term of the MOAs. *See* S & P's Mot. Dismiss Pls.' Compl. at 21–25.

After reviewing S & P's arguments, I am convinced that the County has adequately pled its breach of contract action and the Motion should be denied on this basis.

### A. The County has Adequately Pled That S & P did not Complete its Obligations Under the MOAs.

█ S & P attacks the County's breach of contract allegations on two fronts. First, S & P asserts that:

> [o]n the face of the Complaint, the MOAs make clear that the County understood that S & P was not performing an audit on behalf of the County. *As a matter of law,* the MOAs upon which the County's claim is based establish that S & P never once agreed to advise the County as to the County's business, provide it with legal advice regarding its debt issues, and ensure that its officials were honoring their obligations.

S & P's Mot. Dismiss Pls.' Compl. at 22 (footnote omitted). Second, the County asserts that the cause of action for breach of contract is deficient, because it fails to specify the precise contractual provisions S & P allegedly breached.

The County counters that the Complaint alleges that S & P was hired not simply to issue a rating but also to provide "analytical services." *See* Compl. ¶¶ 89–90. Additionally, the County contends that under its interpretation and understanding of the MOAs,

*grounds,* 972 F.2d 1511 (9th Cir.1992).

S & P did not perform its obligations. *See* Compl. ¶¶ 17–18, 89–92, 140–53 & 172–76.

As noted earlier, a FRCP 12(b)(6) motion may not be used to resolve a contest about the facts or the merits of a case. 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1356 (1990) (citing *Murray*, 539 F.2d at 1387). All allegations of fact in the Complaint are assumed to be true and are considered in a light most favorable to the County. *Clegg*, 18 F.3d at 754; *Western Reserve Oil*, 765 F.2d at 1430. Any reasonable inferences based on the allegations in the Complaint are also to be construed in a light most favorable to the County. *Arcade Water Dist.*, 940 F.2d at 1267.

Clearly, the parties disagree over the interpretation of certain provisions of the MOAs and the contractual obligations undertaken by the parties. In the Complaint, the County has described in exhaustive detail its interpretations and understandings of certain provisions of the MOAs. *See* Complaint ¶¶ 17–18, 89–92 & 140–53.[7] Considering the Complaint in a light most favorable to the County, the County has pled a breach of contract claim upon which relief may be granted.

### B. The County has Adequately Pled That it Performed its Obligations Under the MOAs.

■ S & P also argues that the County's breach on contract claim is defective, because "the County has failed to allege a fundamental requirement of a claim for breach of contract: the County's own performance." S & P's Mot. Dismiss Pls.' Compl. at 22 (citing *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968)).

This argument ignores paragraph 175 of the Complaint. Paragraph 175 states that "[t]he County duly performed all of the conditions required of it under its contract and agreements with S & P or was legally ex-

cused from performing the same." Compl. ¶ 175.

■ The purpose of general notice pleading is to give general notice to the defendant of the nature of plaintiff's claim. *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1153 (9th Cir.1989) (citing *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) (Federal Rules "restrict the pleadings to the task of general notice-giving.")). In *Conley*, 355 U.S. at 47, 78 S.Ct. at 102–03, the United States Supreme Court addressed an argument similar to the one raised by S & P that was brought by respondents to a discrimination suit. The Court held that:

> [t]he **decisive answer to this** is that the Federal Rules of Civil Procedure **do not require a claimant to set out in detail the facts upon which he bases his claim.** To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id.*[8] (footnote omitted) (emphasis added).

S & P cites *Clegg* and notes that the Ninth Circuit has held that a court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg*, 18 F.3d at 754–55 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944–45, 92 L.Ed.2d 209 (1986)) (emphasis added); *see also* Reply S & P Supp.Mot. Dismiss Pls.' Compl. at 12.

■ Determining cases on the basis of pleading errors is viewed with disfavor in the federal courts. If facts alleged by a plaintiff are sufficient to state a claim showing he is entitled to any relief, plaintiff need not set forth the legal theory on which he relies.

---

7. I find no merit in S & P's argument that the Complaint fails to cite the specific contractual provisions that were allegedly violated. The Complaint is clear as to those sections of the MOAs that the County has offered a different interpretation than the one given by S & P.

8. The Court further explained that "[s]uch simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47–48, 78 S.Ct. at 103 (footnote omitted).

*Williams v. Ciba–Geigy Corp.,* 686 F.Supp. 573, 575 (W.D.La.1988).

Paragraph 175 of the Complaint satisfies the notice pleading requirement. It puts S & P on notice of the County's intended claim. Today is not the time for this Court to determine whether in fact the County complied with its obligations under the MOAs. The County has asserted sufficient facts to provide notice to S & P of its breach of contract claim. To the extent that paragraph 175 is a legal conclusion, it is sufficiently based on facts alleged in the Complaint. The Motion is, therefore, denied on this ground.

## IV. THE COUNTY HAS SUCCESSFULLY PLED A PROFESSIONAL NEGLIGENCE CLAIM.

S & P raises several arguments in favor of dismissing the County's claim for professional negligence:

1. S & P contends that it completed all of its obligations under the contract; therefore, it cannot be held liable for professional negligence, *see* S & P's Mot. Dismiss Pls.' Compl. at 25–26;

2. S & P contends that it owed no duty of care to the County, *see* S & P's Mot. Dismiss Pls.' Compl. at 25;

3. S & P contends that there can be no professional negligence claim, because S & P and the County do not enjoy a fiduciary relationship, *see* S & P's Mot. Dismiss Pls.' Compl. at 27–28;

4. S & P contends that policy reasons favor dismissing the County's professional negligence claims, *see* S & P's Mot. Dismiss Pls.' Compl. at 29–30.

For the following reasons, I reject S & P's arguments and deny the Motion to dismiss the County's claim for professional negligence.

A. If S & P Breached its Contract with the County, the County has a Professional Negligence Claim Against S & P.

 In an argument similar to the one it raised against the County's breach of contract claim, S & P argues that it cannot be

held liable for professional negligence, because it performed fully its obligations under the MOAs and the MOAs did not obligate S & P to perform any of the expansive duties that the County alleges in the Complaint.

Absent the existence of the MOAs, S & P clearly would have no independent duty to the County to provide it with ratings. **Thus, the MOAs establish the sole obligations of S & P to the County.... The MOAs plainly do not obligate S & P to perform the expansive duties upon which the County's claims are based.** If the County expected S & P to provide it with advice about the County's debt issues, to perform an audit, or independently investigate whether Citron was acting responsibly, the County was required to contract for such services. Having failed to do so, it is 'appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive.'

S & P's Mot. Dismiss Pls.' Compl. at 26 (citation omitted) (emphasis added).

The MOAs do encompass S & P's obligations to the County. Treating the factual allegations in the Complaint as true, the MOAs may obligate S & P to perform the duties alleged by the County. As noted previously, the parties have different views over the intent and meaning of various words and phrases in the MOAs. At this point, the County's interpretation prevails for pleading purposes.

B. Through its Alleged Contractual Obligations Under the MOAs, S & P Owed a Duty of Care to the County.

 S & P argues that "it owed no duty of care to the County **beyond its obligation to provide a rating.**" S & P's Mot. Dismiss Pls.' Compl. at 25 (emphasis added). S & P urges this court not to find a duty of care between S & P and the County. S & P takes the position that the County cannot sue under both a theory of breach of contract and professional negligence.

Here, S & P owed no duty to the County beyond its obligation to provide the County with a rating. In an attempt to avoid the

limited obligations set forth in the MOAs, the County seeks to convert its defective breach of contract claim into a tort claim. However, the California Supreme Court has soundly and repeatedly rejected such a theory. In *Freeman & Mills, Inc. v. Belcher Oil Co.*, the Supreme Court held that tort recovery is precluded for non-insurance contractual breaches 'in the absence of violation of 'an independent duty arising from principles of tort law.' **The California Supreme Court's refusal to extend tort liability has been based on the premise that an 'omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty.'**

S & P's Mot. Dismiss Pls.' Compl. at 25 (citations omitted) (emphasis added).[9]

However, the California Supreme Court has recognized that a party to a contract may sue both in contract and in tort (e.g. negligence, professional malpractice). *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 406, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) ("we hold that an auditor's liability for general negligence in the conduct of an audit of its clients financial statements is confined to the client, *i.e.*, the person who contracts for or engages the audit services"); *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 180–81, 98 Cal.Rptr. 837, 491 P.2d 421 (1971) ("When such failure proximately causes damage, it gives rise to an action in tort. Since in the usual case, the attorney undertakes to perform his duties pursuant to a contract with the client, the attorney's failure to exercise the requisite skill and care is **also a**

breach of an **express** or **implied term** of that **contract.** Thus, legal malpractice generally constitutes **both a tort and a breach of contract.**") (emphasis added) (footnotes omitted); *see also Weaver v. Bank of America Nat'l Trust & Sav. Ass'n*, 59 Cal.2d 428, 431, 30 Cal.Rptr. 4, 380 P.2d 644 (1963) ("The complaint, we believe, states a cause of action in **both tort and contract.** As *Allen v. Bank of America* [ (1943) 58 Cal.App.2d 124, 136 P.2d 345] sets forth: '(W)henever the bank fails to discharge its agreement by dishonoring a duly presented check, a right of action accrues ... (W)hile in a sense the injury arises from contract it is **nevertheless viewed in another sense, independent of contract, and sounds in tort.'** The weight of authority supports that proposition.") (footnote omitted) (citations omitted) (emphasis added).

"It is an elementary principle that an indispensable factor to liability founded upon negligence is the existence of a duty of care owed by the alleged wrongdoer to the person injured, or to a class of which he is a member." *Richards v. Stanley*, 43 Cal.2d 60, 63, 271 P.2d 23 (1954); *see also* Restatement, Torts § 281(a) & (b), cmts. c, e & g (1938). The duty which S & P owes to the County is based on the privity of the contracts (the MOAs) between the County and S & P and the duty of care that arises from S & P's obligations under those contracts. "A duty of care may arise through statute or by contract." *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 803, 157 Cal.Rptr. 407, 598 P.2d 60 (1979); *see also Eads v. Marks*, 39 Cal.2d 807, 811, 249 P.2d 257 (1952).[10]

**9.** S & P states that it is not advancing the legal proposition that a defendant can never assert an action based in contract and in tort, *see* Reply S & P Supp. Mot. Dismiss Pls.' Compl. at 13 ("Contrary to the County's assertion, S & P's motion is not based on the notion that a defendant can never be sued in contract and tort."); therefore, S & P must be arguing that it is somehow inappropriate in the situation presented by the facts in this case to permit the County to bring a tort action based on negligence and a breach of contract action.

**10.** Because I find that a duty of care arises from privity of contract that arose between the County and S & P under the MOAs, I need not address the more difficult issue of whether an independent duty exists between the County and

S & P outside their contractual relationship. *Compare Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 94–95, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995), *with J'Aire Corp.*, 24 Cal.3d at 803, 157 Cal.Rptr. 407, 598 P.2d 60 ("A duty of care may arise through statute or by contract. Alternatively, a duty may be premised upon the **general character of the activity** in which the defendant engaged, **the relationship between the parties** or even the **interdependent nature of human society.** Whether a duty is owed is simply a shorthand way of phrasing what is 'the essential question whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.") (citations omitted) (emphasis added).

S & P's reliance on *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 102, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995) and *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 515, 28 Cal. Rptr.2d 475, 869 P.2d 454 (1994) to support a finding that no duty of care exists between it and the County is misplaced. In *Freeman & Mills,* the California Supreme Court held that there was no independent tort action for bad faith denial of the existence of a contract. *Freeman & Mills,* 11 Cal.4th at 88, 44 Cal. Rptr.2d 420, 900 P.2d 669. Nothing in *Freeman & Mills* implies that the County cannot sue S & P for both breach of contract and professional negligence.

In *Applied Equipment,* the California Supreme Court held that a contracting party may not be held liable in tort for conspiring with another to interfere with his own contract. *Applied Equipment,* 7 Cal.4th at 515, 28 Cal.Rptr.2d 475, 869 P.2d 454. The court noted that there are important differences between contract and tort theories of recovery; "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." *Id.* As previously noted, in *J'Aire Corp.,* the California Supreme Court has held that an independent duty of care in tort may arise from a breach of contract. *J'Aire Corp.,* 24 Cal.3d at 803, 157 Cal.Rptr. 407, 598 P.2d 60. *Applied Equipment* does not specifically or generally limit the ability of a party to sue for breach of contract and negligence.

Until the breach of contract issues in the Complaint are resolved, it is premature to say that S & P owed the County no duty of care under the MOAs. Therefore, the Motion to dismiss the County's professional neg-

ligence claim on the basis that S & P owed no duty of care to the County is denied.

C. The County's Cause of Action for Professional Negligence is Unaffected by the Lack of a Fiduciary Relationship Between the Parties.

■ S & P asserts that it and the County were not in a fiduciary relationship. S & P's Mot. Dismiss Pls.' Compl. at 27. This is true;[11] however, the existence of a fiduciary relationship between the County and S & P is irrelevant to the County's claim for professional negligence. As stated earlier, the professional negligence claim arises from the duty of care that S & P allegedly owed the County arising from the parties' privity of contract and not from any fiduciary relationship between the parties. *See J'Aire Corp.,* 24 Cal.3d at 803, 157 Cal.Rptr. 407, 598 P.2d 60. Therefore, I find that the lack of a fiduciary relationship has no bearing on whether the County can sue S & P for professional negligence.[12]

D. There are no Valid Policy Reasons That Prohibit the County From Bringing a Professional Negligence Claim Against S & P.

■ S & P alleges that "the position the County champions would do nothing to ameliorate the harm that the County seeks to remedy, and would deprive the public of a source of financial information." S & P's Mot. Dismiss Pls.' Compl. at 30. In essence, S & P argues that exposure to the liability asserted by the County will act as a strong disincentive for a financial publisher to rate issues and issuers. Ultimately, the public will suffer from a lack of valuable information, while the problems that caused the

---

Given the finding that there is a duty through contractual privity, the issue of whether there is an independent duty of care between the parties is moot. If it is eventually determined that S & P did not breach the MOAs, I am unable to imagine a factual scenario in which the County could succeed on its professional negligence claims.

11. The County never asserts that it enjoyed a fiduciary relationship with S & P nor do the allegations in the Complaint support the existence of such a relationship.

12. In fairness to S & P, it should be noted that a large part of S & P's argument in relation to this point addressed S & P's concern about this court finding a duty of care independent of the breach of contract, *i.e.* simply because of their special relationship. *See J'Aire Corp.,* 24 Cal.3d at 803, 157 Cal.Rptr. 407, 598 P.2d 60. As noted *supra* footnote 10, I do not need to find whether S & P and the County's special relationship gave rise to an independent duty of care.

County's loss will continue. S & P cites three cases to support this proposition.[13]

The problem with S & P's argument is that its rationale is inconsistent with the County's claims which are based on S & P's actions rather than the content of S & P's publications. The County is not seeking any damages for the publication of a false rating. S & P cannot rely on broad policy concerns regarding liability for publishing false information to shield it from a claim for professional negligence that is independent of the act of publishing.

The policy concerns raised by S & P are not persuasive given the allegations in the Complaint. The Motion to dismiss the County's professional negligence claim based on policy concerns is, therefore, denied.

## V. THE COUNTY'S CLAIM FOR AIDING & ABETTING BREACH OF A FIDUCIARY DUTY MUST BE DISMISSED, BECAUSE S & P DOES NOT HAVE AN INDEPENDENT FIDUCIARY DUTY TO THE COUNTY.

 S & P argues that recent California case law requires that the County's claim for aiding and abetting breach of a fiduciary duty be dismissed, because S & P does not have an independent fiduciary duty to the County. *See* S & P's Mot. Dismiss Pls.' Compl. at 31–32. S & P argues that *Applied Equipment,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454, and *Doctor's Co. v. Superior Court,* 49 Cal.3d 39, 44, 260 Cal.Rptr. 183, 775 P.2d 508 (1989), hold that "tort liability arising from conspiracy presupposes that the co-conspirator is legally capable of committing the tort." *Applied Equipment,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454. S & P contends that the rationale behind this holding should apply equally to a tort claim for aiding and abetting breach of a fiduciary duty.

The County alleges that under California law aiding and abetting liability does not require the existence of an independent fiduciary duty owing from the aider. *See* Opp. S & P's Mot. Dismiss at 22–26. The County argues that *Applied Equipment* and *Doctor's Co.* are inapplicable and deal with very discrete issues specific to those cases. The County relies on pre-*Applied Equipment* case law that permits a nonfiduciary to bring an action for aiding and abetting breach of a fiduciary duty. *See, e.g., Certified Grocers of Cal., Ltd. v. San Gabriel Valley Bank,* 150 Cal.App.3d 281, 289, 197 Cal.Rptr. 710 (1983).

After reviewing the history of California case law in this area, I am convinced that S & P is correct. A proper interpretation of *Applied Equipment* requires that in order for the County to bring an aiding and abetting breach of a fiduciary duty suit against S & P, S & P must have owed the County an independent fiduciary duty. The County does not allege that S & P owed it an independent fiduciary duty; therefore, the County's claim against S & P for aiding and abetting breach of a fiduciary duty must be dismissed.

In *Lomita Land & Water v. Robinson,* 154 Cal. 36, 40–42, 97 P. 10 (1908), promoters sold property to a corporation in substantial excess of what the promoters paid for the property. *Id.* The promoters kept the profits secret from their associates and the corporation. *Id.* The California Supreme Court held that "[a]s promoters of the corporation, they occupied a fiduciary relation to their cosubscribers, and were bound to truthfully declare to their associates any personal interest that they had in the matter of the purchase. Without such disclosure they could not legally profit at the expense of their associates." *Id.* at 45, 97 P. 10.

The court in *Lomita Land* also found liability against an individual who aided the

---

13. *Bily,* 3 Cal.4th at 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 ("we doubt that a significant and desirable improvement in audit care would result from an expanded rule of liability.... [D]eleterious economic effects appear at least likely to occur"); *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 490 N.E.2d 898, 900 at n. 3 (1986) (extending liability to publisher where plaintiff unjustifiably relied on its erroneous statement would have staggering deterrent effect on potential purveyors of printed material); *Rubinstein v. Collins,* 20 F.3d 160, 173 (5th Cir.1994) ("exposure to such potentially catastrophic liability would create a strong disincentive to anyone contemplating a public prediction").

promoters but who had no independent fiduciary relationship to the corporation. The court held:

'Persons who conspire with promoters of a corporation to induce it to purchase property at a certain price, upon the representation that it is a reasonable price, and the one which has been agreed to be paid to the owner, whereas it is greatly in excess of the sum agreed to be paid, are, equally with the promoters, liable for the secret profits made on the sale of the property to the corporation, although it is not alleged that such persons, other than the promoters, had any dealings with the corporation or its members, or occupied fiduciary relations towards them.... This is on the well-established principle that, **where several persons combine to carry out a fraudulent conspiracy to cheat another,** each and all of such persons are liable to the defrauded party, without reference to the amount of the fruits of the fraudulent transaction he obtains or the degree of his activity in the scheme.' It is not essential to such a liability that such participant was originally a party to the contrivance of the fraud. If, knowing the fraud contrived, he willfully aids in its execution he thus becomes a party to the plan and is chargeable with the consequences. All persons uniting or co-operating [*sic*] in such a wrong are jointly liable for the ensuing injury, irrespective of the degree of culpability.

*Id.* at 45–46, 97 P. 10 (quoting 1 Clark & Marshall, *Private Corporations,* at 327) (citations omitted) (emphasis added).

From 1908 through 1994, the California Supreme Court and the California appellate courts extended vicarious liability to individuals who either aided, abetted, or conspired to breach a fiduciary duty even though the individual was not a fiduciary of the harmed party. *See, e.g., Certified Grocer's,* 150 Cal. App.3d at 289, 197 Cal.Rptr. 710 ("Where there is a common plan or design to commit a tort, all who participate are jointly liable whether or not they do wrongful acts....

Further, a person not himself a fiduciary may be liable for breach of a fiduciary duty as a result of colluding with a disloyal fiduciary."); *Gray v. Sutherland,* 124 Cal.App.2d 280, 290, 268 P.2d 754 (1954); *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 127, 214 Cal. Rptr. 177 (1985).

However, in 1994, the California Supreme Court deviated from the *Lomita Land* standard when it examined the tort of conspiracy. In *Applied Equipment,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454, the court, in denying the liability of an alleged co-conspirator, stated that "[b]y its nature, tort liability arising from conspiracy presupposes that the co-conspirator is legally capable of committing the tort, *i.e.,* that he or she owes a duty to the plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.*[14]

In other words, the court stated that in order to be held liable for conspiracy, the alleged co-conspirator must be capable of committing the underlying tort.

Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles.

*Id.* at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454.

In *Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 1574, 47 Cal.Rptr.2d 752 (1995), the California appellate court examined whether a partner in a joint venture to produce a television series could bring a suit against a fellow partner *and* the distributor of the series for conspiracy and fraud. *Id.* Regarding the conspiracy to breach a fiduciary duty claim brought against the distributor, the court, relying on *Applied Equipment,* held that even if the plaintiff had introduced factual evidence to support its claim against the nonfiduciary defendant, the claim "fails as a matter of law. A nonfiduciary cannot conspire to breach a duty owed only by a fiduciary." *Id.* at 1597, 47 Cal.Rptr.2d 752 (citing *Applied Equipment,* 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454).

---

**14.** The court in *Applied Equipment* specifically held that the "tort cause of action for interference with contract does not lie against a party to the contract." *Applied Equipment,* 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454.

In *Doctor's Co.*, 49 Cal.3d at 41–42, 260 Cal.Rptr. 183, 775 P.2d 508, the California Supreme Court examined the tort of civil conspiracy in the context of a medical malpractice suit against the insurer's attorneys and expert witness. *Id.* The Court held that "[a] cause of action for civil conspiracy may not arise, however, if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the wrongdoing and was acting only as the agent or employee of the party who did not have that duty." *Doctor's Co.*, 49 Cal.3d at 44, 260 Cal.Rptr. 183, 775 P.2d 508.[15]

While the California courts have clearly swayed from *Lomita Land* with regards to the tort of conspiracy, no post-*Applied Equipment* cases have been published specifically dealing with the tort of aiding and abetting breach of a fiduciary duty. The issue is one of first impression.

█ Despite the County's arguments to the contrary, I see no reason for treating the vicarious tort of aiding and abetting breach of a fiduciary duty differently from that of conspiracy to breach a fiduciary duty. "Conspiracy is a concept closely allied with aiding and abetting. A conspiracy generally requires agreement plus an overt act causing damage. Aiding and abetting requires no agreement, but simply assistance. The common basis for liability for both conspiracy and aiding and abetting, however, is concerted action." *Janken v. GM Hughes Electronics*, 46 Cal.App.4th 55, 78, 53 Cal.Rptr.2d 741 (1996).[16]

The underlying rationale of *Applied Equipment* applies to S & P. In *Applied Equipment*, the California Supreme Court noted that holding an entity liable in conspiracy absent an independent duty would "illogically expand the doctrine of civil conspiracy by imposing tort liability for an alleged wrong—interference with a contract—that the purported tortfeasor is legally incapable of committing." *Applied Equipment*, 7 Cal.4th at 510, 28 Cal.Rptr.2d 475, 869 P.2d 454.[17] S & P is in the same situation. If S & P were to be held liable for aiding and abetting breach of a fiduciary duty, it would be vicariously liable for a tort that it is legally incapable of committing against the County. Such a result is contrary to the rationale of *Applied Equipment*.

Finally, the County argues that even if a nonfiduciary cannot be held liable for aiding and abetting a breach of a fiduciary duty, its claim is still valid under the exception noted in *Doctor's Co.* See S & P's Mot. Dismiss Pls.' Compl. at 26. The Complaint alleges that S & P profited from its aiding and abetting because of the fees that S & P received in connection with the County's 1994 offerings. *See* Compl. ¶ 185. The County asserts that this alone meets the exception delineated in *Doctor's Co.*

█ This argument is incorrect. While *Doctor's Co.* did provide for an exception to the general rule limiting vicarious liability when the nonfiduciary acts in furtherance of its own financial gain,[18] the gain must be more than the fees received from

---

**15.** *Doctor's Co.* recognized that there is an exception to this rule when the nonfiduciary has acted not simply as agent or employee, but has acted in furtherance of its own financial gain. *Doctor's Co.*, 49 Cal.3d at 46–47, 260 Cal.Rptr. 183, 775 P.2d 508 (the holding of the case does not preclude "the subjection of agents to conspiracy liability for conduct which the agents carry out 'as individuals for their individual advantage' and not solely on behalf of the principal").

**16.** It is worth noting that *Heckmann* and *Certified Grocers*, two cases relied on by the County that are pre-*Applied Equipment*, both cite *Sutherland* in reaching the conclusion that a nonfiduciary may be held liable for aiding and abetting breach of a fiduciary duty. *Sutherland* was a case that dealt directly with conspiracy, not aiding and

abetting. *See Sutherland*, 124 Cal.App.2d at 289, 268 P.2d 754 ("it was essentially a tortious taking by two joint tortfeasors in common agreement"). This further supports the finding that there is no logical reason to treat the tort of conspiracy different from that of aiding and abetting.

**17.** "To impose tort liability upon the contract breaker because of the involvement of a third person (when liability is limited to contract damages when the contract breaker is acting alone) undermines the policies which have developed limited contractual liability." *Applied Equipment*, 7 Cal.4th at 518, 28 Cal.Rptr.2d 475, 869 P.2d 454.

**18.** *See supra* note 15.

the fiduciary-defendant that the nonfiduciary is accused of conspiring with.[19] *Doctor's Co.,* 49 Cal.3d at 46–47, 260 Cal.Rptr. 183, 775 P.2d 508. In *Doctor's Co.,* the fact that the attorneys had been hired by the insurance company did not warrant the attorney's liability for conspiracy with the insurance company's breach of its duty to settle. *Id.* at 43–44, 49, 260 Cal.Rptr. 183, 775 P.2d 508. In the Complaint, there is no alleged financial gain for S & P other than the fees it received from the County in connection with the note offerings. This is not enough to meet the exception delineated in *Doctor's Co.*

## CONCLUSION

S & P's broad-based argument for dismissal of the Complaint based on alleged First Amendment protections is without merit. The Motion to dismiss based on the First Amendment is, therefore, denied.

The County has successfully pled both a breach of contract action and a professional negligence action against S & P. The Motion to dismiss these two claims is, therefore, denied.

Finally, because the County has not alleged that S & P owed it an independent fiduciary duty, the Motion to dismiss the County's claim for aiding and abetting breach of a fiduciary duty is granted.

Separate findings of fact and conclusions of law with respect to this memorandum opinion are unnecessary. This memorandum opinion shall constitute my findings of facts and conclusions of law.

---

**19.** The County's reading of the exception would destroy the holding in *Doctor's Co.,* since virtually all agents or employees of a defendant-fiduciary who is being sued for breach of its fiduciary duty would have received some form of compensation from the fiduciary. The harmed party would always be able to assert the exception to find the agent or employee liable for conspiracy. The County's argument contradicts the holding in *Doctor's Co.*